656 A.2d 804

**NORTHWEST LAND CORPORATION,**

v.

**MARYLAND DEPARTMENT OF THE ENVIRONMENT, et al.**

**No. 1325, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

April 6, 1995.

472

474

Michael J. Collins (Neuberger, Quinn, Gielden, Rubin & Gibber, P.A. on the brief), Baltimore, for appellant.

Nancy W. Young, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Neile S. Friedman, Asst. Atty. Gen. on the brief for appellee, Dept. of the Environment), Max H. Lauten (Andrew Jay Graham and Kramon & Graham, P.A. on the brief for appellee, Villa Julie College, Inc.), Baltimore, for appellees.

Argued Before FISCHER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

Appellant, Northwest Land Corporation (Northwest), appeals from a judgment entered in the Circuit Court for Baltimore County (Howe, J.) affirming a final administrative decision of the Maryland Department of the Environment (MDE). The MDE issued a Final Determination recommending issuance of a National Pollutant Discharge Elimination System (NPDES) permit to Villa Julie College, Inc. (Villa Julie) for discharge of waste water effluent into an unnamed, intermittent stream on Villa Julie property that also crosses property owned by Northwest located downstream. Northwest challenged the MDE's Final Determination and a hearing was held before Administrative Law Judge (ALJ) Susan S. Wagner of the Office of Administrative Hearings. ALJ Wagner issued a Recommended Decision affirming the MDE's

Final Determination, with certain modifications. Northwest filed exceptions to ALJ Wagner's Recommended Decision and, after a hearing before the Final Decision Maker for the MDE, the MDE issued its Final Decision and Order affirming in part and rejecting in part ALJ Wagner's Recommended Decision. Northwest appealed the MDE's Final Decision and Order to the Circuit Court for Baltimore County. The circuit court affirmed the MDE's Final Decision and Order and dismissed Northwest's appeal. Northwest filed a timely appeal to this Court.

## ISSUES

I. Did the Secretary of the Department of the Environment err in the issuance of the NPDES discharge permit to Villa Julie where the permit does not comply with the approved Baltimore County water and sewer plan?

II. Did the Secretary of the Department of the Environment err in the issuance of the NPDES discharge permit to Villa Julie where the discharge permit effluent limitations do not comply with applicable state and federal law?

III. Did the Secretary of the Department of the Environment err in the issuance of the NPDES discharge permit to Villa Julie where the record before the Department demonstrates that there are feasible alternatives to Villa Julie's proposed sewage treatment plant and use of the intermittent stream for discharge of waste water effluent?

IV. Did the Secretary of the Department of the Environment err in the issuance of the NPDES discharge permit to Villa Julie where the discharge to the intermittent stream violates appellant's riparian rights to the use and enjoyment of the stream in its natural condition?

V. Did the Secretary of the Department of the Environment err in the issuance of the NPDES discharge

permit to Villa Julie where Maryland law provides that the Secretary may order Baltimore County to extend sewage to the College as an alternative to discharge into the intermittent stream?

Before we reach the merits of these issues, we shall set out the statutory and factual background of this case.

## The Regulatory Scheme

The MDE is charged, *inter alia,* with managing, improving, controlling, and conserving the waters of Maryland. *See Howard County v. Davidsonville Civic & Potomac River Ass'ns, Inc.,* 72 Md.App. 19, 23, 527 A.2d 772, *cert. denied sub nom. St. Mary's County Watermen's Ass'n v. Howard County,* 311 Md. 286, 533 A.2d 1308 (1987). A person may not discharge pollutants into the waters of this State or operate any facility that discharges pollutants except as permitted by a state discharge permit issued by the MDE. Md.Code Ann., Envir. §§ 9–322, 9–323 (1993 Replacement Volume). The MDE is authorized to adopt rules and regulations that set effluent standards [1] for discharge permits and water quality limitations [2] to protect public health, recreation, industry, and wildlife. *Id.* § 9–314. In adopting regulations, the MDE is to consider, among other things, the character of the area involved, the nature of the receiving body of water, and the technical feasibility and the economic reasonableness of measuring or reducing the particular type of water pollution at issue. *Id.* § 9–313.

---

**1.** Effluent standards "specify the permissible levels of allowable wastes and the physical, thermal, chemical, biological and radioactive properties of allowable wastes." *Howard County,* 72 Md.App. at 23 n. 1, 527 A.2d 772 (citing Md.Code Ann., Envir. § 9–314(b)(2) (1993 Replacement Volume)).

**2.** Water quality limitations "set the maximum allowable short and long term concentrations of pollutants in the water, the permissible temperature range, and the maximum permissible level of dissolved oxygen in the water." *Howard County,* 72 Md.App at 23–24 n. 2, 527 A.2d 772 (citing Md.Code Ann., Envir. § 9–314(b)(1)).

The MDE may issue a discharge permit upon its determination that the terms of the permit meet all state and federal regulations, water quality standards, and appropriate effluent limits. *Id.* § 9–324. The MDE's effluent standards must be at least as stringent as the federal standards.[3] *Id.* § 9–314(c).

A discharge permit for privately-owned waste water treatment plants, such as the one proposed by Villa Julie, must comply with effluent limitations, receiving water quality standards, ground water quality standards established by the state, and federal and state law. Md.Regs.Code tit. 26, § 26.08.04.02.A(1)(a)–(d) (1988 & Supp.1994) [hereinafter CO-MAR]. The plant discharge permit must also comply with the basin water quality management plan[4] and the approved county water and sewerage plan.[5] *Id.* § 26.08.04.02.A(3)(a), (b).

### FACTS

Villa Julie College, founded in 1947, is a private college in the Greenspring Valley area of Stevenson, Maryland. In

---

3. Federal and state law require that a person hold a federal NPDES permit prior to discharging pollutants into any navigable waters of the United States. Federal Water Pollution Control Act, 33 U.S.C. §§ 1341(a), 1342 (1988). If the state program meets certain requirements, the United States Environmental Protection Agency (EPA) approves the program and suspends its own NPDES licensing program in that state. The EPA continues to receive copies of applications for NPDES permits and retains the power to veto state NPDES permits. *Howard County,* 72 Md.App. at 24 n. 3, 527 A.2d 772; *see also District of Columbia v. Schramm,* 631 F.2d 854, 857 (D.C.Cir.1980).

4. The basin water quality management plan is adopted pursuant to Md.Code Ann., Nat.Res. § 3–106 (1989 Replacement Volume & 1994 Supp.). Maryland is divided into service regions. The management plan is a five-year plan for each service region which concerns the water supply, waste water purification, and solid waste disposal. *See Howard County,* 72 Md.App. at 25 n. 6, 527 A.2d 772.

5. The governing body of each county adopts and submits to the MDE a county plan that concerns, *inter alia,* water supply, sewage, and solid waste disposal. Md.Code Ann., Envir. § 9–503 (1993 Replacement Volume & 1994 Supp.).

early 1990, Villa Julie learned that its septic system[6] had failed. Specifically, Villa Julie's and the adjacent Sisters's property have a very high water table (indeed, the septic system is in the water table) and clay soils. Percolation tests performed on the properties indicated that the percolation levels do not meet the minimum criteria for a filter drain system by Baltimore County standards.

As there are no public sewage facilities available in the Greenspring Valley,[7] Villa Julie has been forced to pump its excess waste water into storage tanks and haul it away by truck on a daily basis. According to Gene Neff, Director of Public Works for Baltimore County, however, this "pump and haul" method is only permitted in Baltimore County as a short-term solution to waste water disposal problems.[8] Therefore, Villa Julie engaged the services of Maryland Environ-

---

**6.** According to appellees' counsel at oral argument, the property on which Villa Julie is situated was once owned by the Baltimore Province–Sisters of Notre Dame (Sisters), one of Villa Julie's current adjacent landowners. At that time, a single septic system was installed with two adjacent drainage fields. When the Sisters subsequently sold a portion of their property to what is now Villa Julie, the septic system remained on the Sisters's property. Consequently, Villa Julie's failed septic system is located on the Sisters's property. Again, according to appellees' counsel, assuming Villa Julie can somehow accommodate its increased waste water discharge (e.g., a waste water treatment plant), the current septic system located on the Sisters's property would be adequate for continued use only by the Sisters. The record does not disclose whether, and to what extent, the current septic system on the Sisters's property would accommodate increases in effluent flow occasioned by intensification of the existing uses on the Sisters's property.

**7.** The current Baltimore County Water and Sewer Plan classifies the area of the County where Villa Julie College is situated as a "No planned community service area" and therefore does not permit extension of public water or sewerage to Villa Julie College. 19 Md.Reg. 641, 714 (Mar. 20, 1992).

**8.** In addition, state regulations provide that holding tanks "may not be permitted to serve new construction or for the purpose of adding capacity to an existing disposal system in order to accommodate a change in property use." COMAR § 26.04.02.03.B.

mental Services, Inc. (MES)[9] to assist in solving its sewage problems. MES completed an initial evaluation of Villa Julie's existing septic system. Dane Sherman Bauer, MES's project manager for the Villa Julie project, explained:

> We went to Baltimore County and got—and from the college and got whatever was available in the way of as-built drawings [of the existing septic system] to begin with. It had been modified at least once that we could find. We assessed that it was approximately 10,000 gallons we felt in size, although some of the preliminary plans showed it to be about 6,000.
>
> We examined the area where the tile fields were to try to ascertain exactly where the tile fields were as compared to the drawing. We found that the system was failing immediately upon examining it, failing in the sense that there was water coming out of the ground—waste water coming out of the ground around the whole area where the tile fields were. We did some early-on flow determinations to see how much water was actually going into these systems as compared to the design and found that they were significantly hydraulically overloaded.

MES investigated other forms of waste water treatment on the Villa Julie property. First, the possibility of installing another septic system was examined. MES recommended against the installation of another septic system because "the entire property was generally subject to high water table and . . . the soil conditions were silt, loam with heavy clay content

---

9. The Maryland Environmental Services (MES) is a quasi-public state agency that has state operating authority and can operate as a corporate entity. Its general charge is to assist both the state and the local governments and private enterprises with various types of environmental projects from their conception and planning to design, construction, operation, financing, and overall management, including getting necessary permits and local approvals in accordance with state and federal laws.

and perk [sic] tests failed throughout." Second, MES examined the possibility of implementing spray irrigation,[10] and concluded that it would be inadequate to accommodate the amount of discharge contemplated by Villa Julie.[11] Third, MES considered an on-site mound system [12] to rectify Villa Julie's sewage problem. A mound system, however, requires a site that percolates, and was therefore incompatible with Villa Julie's property. MES's final recommendation to Villa Julie was "to put in some sort of a on-site waste water treatment plant discharged to one of several locations that were available to the college."

On 17 January 1991, pursuant to Villa Julie's application, the Office of Planning and Zoning, the Department of Environmental Protection and Resource Management, and the Department of Public Works jointly proposed an amendment to the Baltimore County Water and Sewer Plan (the Plan), which authorized the construction of a private waste water treatment plant for the combined properties of the Sisters and Villa Julie.[13] After two public hearings, the Baltimore County Council passed Resolution 2–91, which provided, *inter alia,*

---

**10.** Spray irrigation is a land treatment method of disposal in which sewage is collected, stored on the land in excavated or bermed open lagoons, and ultimately sprayed on vegetated areas through an irrigation system of risers and spray nozzles.

**11.** Mr. Bauer also explained that another reason MES recommended against spray irrigation was the inability "to restrict the area from so many students."

**12.** A mound system is sometimes used on property with a very high water table. An earthen mound is built to increase the distance between the surface and the water table.

**13.** In 1975, the Greenspring Valley area was rezoned from a Rural Deferred Zone to a Rural Conservation Zone (RC–2). Since then, Villa Julie has existed as a lawful nonconforming use in the RC–2 zone. Villa Julie is currently seeking a special exception under the Baltimore County Zoning Regulations to accommodate its proposed construction of certain new buildings and a private waste water treatment plant on its property. Certain aspects of the zoning case are before this Court in *Villa Julie College, Inc. v. Valleys Planning Council, et al.,* No. 1033, September Term 1994.

6. The maps attached hereto and marked as Exhibit 6 entitled "Villa Julie College and Baltimore Province—Sisters of Notre Dame Revision to the Water Supply and Sewerage Plan" are hereby approved with special authorization to operate an existing community water system for the combined properties and with special authorization to operate a community sewage treatment plant for the combined properties, with capacity subject to special exception to the RC–2 Zoning. This authorization is also granted pursuant to Section 34–7 of the Baltimore County Code, 1978.[14]

On 14 June 1991, Villa Julie applied for a NPDES permit from the MDE to discharge up to 62,900 gallons per day of treated waste water effluent from its proposed waste water treatment plant into an intermittent stream that flows through its property, as well as property owned by Northwest, and into the Jones Falls downstream. Villa Julie's permit application also included an estimated discharge capacity for the Sisters's property in its calculations. Subsequent to filing the permit application, a flow measurement study and Sewage Treatment Plant Alternatives Evaluation were conducted for Villa Julie. As a result of these studies, Villa Julie amended its permit application to request approval to discharge up to 60,000 gallons per day. On 21 November 1991, a public hearing was held to address surrounding landowners' concerns about Villa Julie's permit request.[15]

On 20 March 1992, the MDE issued its Notice of Final Determination, indicating that it would approve Villa Julie's

---

14. The MDE subsequently wrote to the Baltimore County Council on 28 June 1991 and stated:

Amendment 6 as adopted, authorizes the operation of a community sewage treatment plant without establishing its capacity. After the capacity has been established, the county must submit an amendment to the county plan stating the final design capacity of this wastewater facility.

15. On 14 November 1991, Villa Julie also applied to the Water Resources Administration of the Department of Natural Resources for a water appropriation permit pursuant to Md.Code Ann., Nat.Res. § 8–808 (1990 Replacement Volume).

application for a discharge permit. The MDE determined that the discharge, as limited by the proposed effluent limitations, would not cause any violations of water quality standards in the intermittent stream, the Jones Falls, or Lake Roland. The Notice of Final Determination contained the following Summary:

> There is no feasible alternative to a discharge to the intermittent stream on the College's property. Water quality conditions in Jones Falls, above and below Villa Julie College, were used to establish discharge permit parameters which would protect the receiving water and prevent water quality violations. The permit will be based on a flow of 60,000 gpd. The limitations will remain as drafted except for the pound loadings for $BOD_5$, suspended solids, ammonia, and total phosphorous, which will be set to correspond to the lowered flow. For $BOD_5$, they will be 2.3 kg/day (5.0 lbs/day) for the maximum monthly average and 3.4 kg/day (7.5 lbs/day) for the maximum weekly average from June through September, and 6.8 kg/day (15 lbs/day) for the maximum monthly average and 10 kg/day (23 lbs/day) for the maximum weekly average from October through May. For suspended solids, the loading shall be 6.8 kg/day (15 lbs/day) maximum monthly average and 10 kg/day (23 lbs/day) maximum weekly average. For total phosphorous, they shall be 0.05 kg/day (0.10 lbs/day) maximum monthly average and 0.07 kg/day (0.15 lbs/day) maximum weekly average. For ammonia nitrogen, the loading shall be 0.23 kg/day (0.50 lbs/day) maximum monthly average and 0.34 kg/day (0.75 lbs/day) maximum weekly average.

Northwest and several surrounding landowners (petitioners) [16] requested an adjudicatory hearing on the MDE's issuance of the NPDES discharge permit to Villa Julie. On 15 May 1992, an appeal was scheduled with the Office of Adminis-

---

16. The petitioners included: Douglas G. Carroll, Mr. and Mrs. Barton S. Mitchell, Clark Farm Associates, Thomas F. Obrecht, Mr. and Mrs. Timothy M. Rodgers, Mr. and Mrs. Richard F. Blue, Jr., The Valleys Planning Council, Inc., Richard B. Buck, Lawrence P. Naylor, III, and J. Stephen Immelt.

trative Hearings. On 18 September 1992, a motions hearing was held before ALJ Wagner. On 1 October 1992, she issued an order (i) granting the motion to dismiss Valleys Planning Council as a petitioner for lack of standing, (ii) rejecting petitioners' claim that MDE failed to comply with Md.Code Ann., Envir. § 9–324(c), which requires an informational hearing to be held at least fifteen days before the public hearing, (iii) striking the issue of riparian rights of downstream owners raised by petitioners, (iv) dismissing petitioners' claim that they had been harmed by MDE's receipt of additional evidence from Villa Julie after the conclusion of the public hearing, and (v) reserving a ruling on the standing of other petitioners until the issuance of her Recommended Decision.

A hearing was commenced on 11 January 1993. Dr. F. Pierce Linaweaver, an expert in environmental and civil engineering, and Richard D. Klein, an expert in water quality standards, testified as expert witnesses for the petitioners. On behalf of Villa Julie, the following expert witnesses testified: Steven Lewis Luckman, as an expert in stream water quality standards and water quality monitoring; James Allison, as an expert in water pollution biology; Frederick Chadsey, as an expert in civil engineering, percolation tests, soil boring interpretation, soil maps, and identification of soils; Dr. F. Pierce Linaweaver, as an expert in water quality, waste water management, and waste water treatment; and Dane Sherman Bauer, as an expert in water and waste water, issuance of discharge permits, and federal and state water quality regulations.

On 23 March 1993, ALJ Wagner issued a Recommended Decision making the following substantive Conclusions of Law:

5. The proposed permit complies with *COMAR Title 26* and *Md.Code Ann., Environmental Article Title 9.*

 a. It complies with the intermittent stream regulation *COMAR 26.08.02.05B.*

 b. It complies with the Water Quality Standards contained in *COMAR 26.08.02.01–.03.*

 c. The plans and specifications supplied by Applicant comply with *COMAR 26.08.04.01D(3)* and *Md.Code Ann., Environmental Article § 9–325.*

 d. It complies with the Basin Water Quality Management Plan as contained in *COMAR 26.01.04.02A(3)(a).*

 e. It complies with the criteria for issuance of discharge permits contained in *COMAR 26.08.04.02A.*

6. The proposed permit is consistent with the Baltimore County zoning decision regarding flow.

7. MDE has no authority in this case to order an extension of the public sewer to [Villa Julie College].

8. It complies with *COMAR 26.08.02.05B(1)* as there are no feasible alternatives to discharge into the intermittent stream.

 a. The use of holding tanks by VJC is not a feasible alternative to discharge into the intermittent stream.

 b. A spray irrigation system is not a feasible alternative to discharge into the intermittent stream.

 c. A mound system is not a feasible alternative to discharge into the intermittent stream.

 d. The proposed Easement Agreement is not a feasible alternative to discharge into the intermittent stream.

Northwest and other petitioners filed exceptions to the Recommended Decision on 14 April 1993. A hearing was held on 14 September 1993 before the Final Decision Maker for the MDE and, on 23 November 1993, he issued a Final Decision and Order directing that the discharge permit be issued.[17] Northwest appealed to the Circuit Court for Baltimore County and, on 7 July 1994, the circuit court found that the MDE's "decision is supported by competent, material, and substantial evidence and that the decision is not affected by any error of

---

17. The Final Decision and Order rejected as too narrow the ALJ's recommendation that the MDE, as a matter of law, adopt "a statutory interpretation of COMAR [§] 26.08.02.05B(1) that the only feasible alternative to discharge into an intermittent stream is the availability of a perennial stream into which the discharge could be made."

law." Pursuant to Md.Rule 7–209, the circuit court dismissed Northwest's appeal and affirmed the MDE's Final Decision and Order.

## STANDARD OF REVIEW

The Court of Appeals recently stated that "[j]udicial review of administrative agency action is narrow." *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226 (1994). In *Citizens for Rewastico Creek v. Commissioners of Hebron,* 67 Md.App. 466, 470, 508 A.2d 493, *cert. denied,* 307 Md. 260, 513 A.2d 314 (1986), this Court explained:

> [A] very limited standard of review [is] applicable to the decisions of administrative agencies.... The administrative decision will not be disturbed on appeal if substantial evidence supports factual findings and no error of law exists.

Stated another way:

> We have made it quite clear that if the issue before the administrative body is "fairly debatable", that is, that its determination involved testimony from which a reasonable man could come to different conclusions, the courts will not substitute their judgment for that of the administrative body....

*Eger v. Stone,* 253 Md. 533, 542, 253 A.2d 372 (1969); *accord Enviro–Gro Technologies v. Bockelmann,* 88 Md.App. 323, 329, 594 A.2d 1190 (citing *Harford County v. McDonough,* 74 Md.App. 119, 122, 536 A.2d 724 (1988)), *cert. denied,* 325 Md. 94, 599 A.2d 447 (1991); *Gray v. Anne Arundel County,* 73 Md.App. 301, 307–09, 533 A.2d 1325 (1987).

This narrow scope of review is imposed because "[c]ognizance must be taken of the agency expertise and the administrative decision therefore carries a presumption of correctness." *Citizens for Rewastico Creek,* 67 Md.App. at 470, 508 A.2d 493. A reviewing court is not permitted to substitute its judgment for that of the agency within this sphere of the agency's range of discretion, absent a purely legal issue being involved. *Id.*

This Court in *Secretary of Health & Mental Hygiene v. Crowder*, 43 Md.App. 276, 281, 405 A.2d 279 (1979) (citations omitted), further explained the rationale for this rule:

> State administrative "agencies are created in order to perform activities which the Legislature deems desirable and necessary" to further the public health, safety, welfare, and morals.
>
> . . . .
>
> The powers vested in the courts, by statute or inherence, to review administrative decisions does not carry with it the right to substitute its fact finding process for that of an agency.

"With these precepts in mind, the circuit court must review the record before the agency and decide whether there was substantial evidence before the agency, based on the record as a whole, to support the agency's conclusions and final order." *Howard County*, 72 Md.App. at 35, 527 A.2d 772 (citing *Peppin v. Woodside Delicatessen*, 67 Md.App. 39, 44–45, 506 A.2d 263 (1986)).

■ In reviewing the decision of the circuit court in an appeal from a decision of an administrative agency, the role of the Court of Special Appeals "is essentially to repeat the task of the circuit court; that is, to be certain the circuit court did not err in its review." *Mortimer v. Howard Research & Dev. Corp.*, 83 Md.App. 432, 442, 575 A.2d 750 (citations omitted), *cert. denied*, 321 Md. 164, 582 A.2d 499 (1990). "This standard of review specifically applies to a final order of the [MDE] issuing a discharge permit for a . . . wastewater treatment plant." *Howard County*, 72 Md.App. at 35, 527 A.2d 772 (citing *Citizens for Rewastico Creek*, 67 Md.App. at 470, 508 A.2d 493).

## DISCUSSION
### I.

Northwest contends that Md.Code Ann., Envir. § 9–511 (1993 Replacement Volume) and COMAR § 26.08.04.02.A(3)(b)

both require that a NPDES discharge permit must comply with the county water and sewer plan. Therefore, argues Northwest, the MDE erred in issuing Villa Julie's discharge permit because it "does not conform to the approved water and sewer plan of Baltimore County." Specifically, Northwest argues that the Plan authorizes only a *community*[18] waste water treatment plant to be constructed on Villa Julie property, whereas Villa Julie "proposes to construct a *multiuse*[19] sewerage treatment plant, which will serve its property exclusively."

■ Villa Julie, as a threshold issue, suggests that Northwest's argument in this regard is barred by Md.Code Ann., Envir. § 1–605(d) (1993 Replacement Volume & 1994 Supp.). That section provides that "[a] party may not, in a contested case hearing, challenge a facility's compliance with zoning and land use requirements or conformity with a county plan issued under Title 9, Subtitle 5 of this article." *Id.* We note, however, that Northwest is not challenging the *facility's* compliance with the Plan, but instead challenges the *discharge permit's* compliance with the Plan. Section 1–605(d) is therefore not applicable in the instant case.

■ Similarly, we hold that Md.Code Ann., Envir. § 9–511 is not applicable to the case at bar. That section provides that a sewerage system cannot be *installed or extended* unless it conforms to the county plan or revision or amendment of the county plan. Villa Julie, however, is not, at this stage of the proceedings, seeking a permit to install its waste water treatment plant. Md.Code Ann., Envir. § 9–204 (1993 Replacement Volume) governs the installation permit process for

---

**18.** A "community sewerage system" is defined as "a publicly or privately owned sewerage system that serves at least 2 lots." Md.Code Ann., § 9–501(b) (1993 Replacement Volume).

**19.** A "multiuse sewerage system" is defined as "a sewerage system that: (1) [s]erves only one lot; (2) [s]erves a number of individuals; (3) [h]as a treatment capacity of more than 5,000; (4) [i]s not publicly owned or operated." Md.Code Ann., Envir. § 9–501(i) (1993 Replacement Volume).

waste water treatment plants. Although section 9–511 may require that the installation and/or extension permit, issued pursuant to section 9–204, comply with the Plan, it is not applicable to the discharge permit process contemplated by section 9–323 and at issue in the case *sub judice.*

COMAR § 26.08.04.02.A(3)(b) does, however, directly apply to the discharge permit process and requires that "the discharge or proposed discharge ... [comply] with ... [t]he approved county water and sewerage plan adopted pursuant to Environmental Article, Title 9, Subtitle 5, Annotated Code of Maryland." As the MDE has already determined that the discharge from Villa Julie's proposed waste water treatment plant "is consistent with the Baltimore County Water and Sewer Plan," we need only decide whether there is substantial evidence in the record to support that determination. We hold that such substantial evidence exists.

■ The Baltimore County Water and Sewer Plan, as amended by Resolution 2–91, states that Villa Julie and the Sisters may "operate a community sewage treatment plant for the combined properties, with capacity subject to a special exception."[20] Northwest contends that, because the Sisters "did not join Villa Julie in its application for a NPDES discharge permit," and because Villa Julie proposes a multiuse sewage treatment plant as opposed to a community sewage treatment plant, the permit issued did not conform to the Plan. Northwest fails to acknowledge, however, that, although the Sisters did not "join" in Villa Julie's permit application, the permit application submitted by Villa Julie did include estimated discharge from the Sisters in its calculations of the effluent to be treated by the ultimate facility. Accordingly, because the terms of the proposed permit were based upon the permit application and its calculations, it is of no consequence that Villa Julie and the Sisters were not co-applicants.

---

20. On 10 July 1990, the Baltimore County Zoning Commissioner determined the discharge capacity of the plant to be 50,000 gallons per day.

■ We note also that the MDE, in issuing the NPDES discharge permit, did not make a determination as to whether the discharge approved in the permit would emanate from a community waste water treatment plant or a multiuse waste water treatment plant, as that issue was not before it. So long as the proposed discharge conforms with the Plan, and we hold that it does, the MDE need not determine the propriety of operating a community versus a multiuse waste water treatment plant on Villa Julie's property at the discharge permit stage of the process.

Northwest also argues that, because the proposed discharge specified in the permit application must be in compliance with all applicable requirements of federal and state law, *see* COMAR § 26.08.04.02.A(1)(d), the MDE erred in issuing the discharge permit to Villa Julie prior to obtaining local zoning approval for the installation of Villa Julie's proposed waste water treatment plant. Appellees, on the other hand, argue that section 26.08.04.02.A(1)(d) states that the proposed discharge must comply with federal and state law, not with local zoning ordinances, and therefore the MDE was correct in issuing the discharge permit without local zoning approval.

■ While section 26.08.04.02.A(1)(d) does not, on its face, require compliance with local zoning ordinances, we hold that a NPDES discharge permit may be subject to certain applicable local zoning ordinances. This does not mean, however, as Northwest suggests, that zoning approval for the proposed facility must be obtained prior to issuing the discharge permit. The MDE, as in the case *sub judice,* may issue the permit *subject to* local zoning ordinances, without first satisfying itself that local zoning approval has been obtained.[21] As the MDE properly contemplated compliance with local zoning ordinances in issuing the NPDES discharge permit to Villa Julie, we hold that there was no error in

---

21. In its Notice of Final Determination, the MDE noted that, "[s]hould zoning approval be granted to expand the College beyond the flow contemplated in this permit, the permittee will have to make application to have the permit modified."

issuing the discharge permit prior to the obtention by Villa Julie of local zoning approval for the proposed waste water treatment plant.

## II.

The MDE has adopted water quality standards to protect the public health and welfare, enhance the quality of water, protect aquatic resources, and serve the purposes of the Federal Act. COMAR § 26.08.02.01.A. These water quality standards consist of two parts: designated uses of the water,[22] and water quality criteria to protect the designated uses.[23] *Id.* § 26.08.02.01.B(1). In assigning use designations to each body of water in Maryland, the MDE evaluates the biological, chemical, and physical data compiled for the body of water. *Id.* § 26.08.02.07. In the instant case, the Jones Falls and its tributaries (including the intermittent stream at issue) are designated as Use III waters, and therefore are subject to the water quality criteria set forth in COMAR § 26.08.02.03–3.D. In issuing a NPDES discharge permit for discharge into an intermittent stream, the MDE must ensure that the effluent limitations set forth in the permit are not less stringent than: (1) the minimum national effluent guidelines established under the Federal Act; (2) those levels necessary to maintain the water quality standards of downstream segments; (3) those levels necessary to protect the biological community of the intermittent stream; or (4) those levels necessary to protect public health. COMAR § 26.08.02.05–1.C.

---

**22.** Designated uses include: Use I (Water Contact Recreation, and Protection of Aquatic Life); Use I–P (Water Contact Recreation, and Protection of Aquatic Life, and Public Water Supply); Use II (Shellfish Harvesting Waters); Use III (Natural Trout Waters); Use III–P (Natural Trout Waters and Public Water Supply); Use IV (Recreational Trout Waters); Use IV–P (Recreational Trout Waters and Public Water Supply). COMAR § 26.08.02.02.B; 40 C.F.R. § 131.10(a) (1994).

**23.** Water quality criteria specific to designated uses are set forth in COMAR § 26.08.02.03–3. *See also* 40 C.F.R. § 131.11 (1994). The MDE has adopted only those criteria that are scientifically defensible. *Id.*

■ Northwest argues that the effluent limitations in Villa Julie's NPDES discharge permit are insufficient to protect the biological community of the intermittent stream. First, Northwest suggests, albeit without any substantiation, that COMAR § 26.08.01.01 requires that effluent limitations for pollutants, particularly ammonia, must be stated in maximum *daily* quantitative limitations to protect the biological community of the intermittent stream into which the effluent will be discharged; Villa Julie's discharge permit only provided for maximum weekly and monthly average limitations for $BOD_5$, suspended solids, ammonia nitrogen, and total phosphorous. As noted by appellees, however, COMAR § 26.08.01.01 is a definitional section and nowhere requires the MDE to set maximum *daily* quantitative limitations on any pollutants.

■ Second, Northwest contends that COMAR § 26.08.04.02–1.A(1), which provides that "[e]ach discharge permit, unless inappropriate, shall specify average and maximum daily quantitative limits, in terms of weight, for the discharge of pollutants in the authorized discharge," also requires the MDE to express ammonia limitations in maximum daily quantitative limitations. Northwest, however, failed to raise this argument before the MDE. Although Mr. Klein, testifying on behalf of Northwest, stated that the ammonia limits should be expressed in maximum values as opposed to average values, he did not testify that the ammonia limits should be stated in daily maximums, as allegedly required by COMAR § 26.08.04.02–1.A(1), as opposed to weekly and monthly maximums.

It is axiomatic that "a person may not obtain judicial review of a matter when he or she failed to properly raise the matter before the administrative agency." *Heft v. Maryland Racing Comm'n*, 323 Md. 257, 273–74, 592 A.2d 1110 (1991). *See, e.g., Consumer Protection v. Consumer Publishing Co.*, 304 Md. 731, 775, 501 A.2d 48 (1985); *Prince George's Doctors' Hosp. v. Health Servs. Cost Review Comm'n*, 302 Md. 193, 226, 486 A.2d 744 (1985); *Cicala v. Disability Review Bd.*, 288 Md. 254, 261–62, 418 A.2d 205 (1980). Therefore, Northwest's argu-

ment concerning COMAR § 26.08.04.02–1.A(1) was not preserved for our review.

■ Third, Northwest argues that, because the MDE failed to conduct a special biological assessment of the intermittent stream, there is "no adequate assurance that the biological community in the stream will be protected by the effluent limitations contained in Villa Julie's permit because the [MDE] does not know what animal or plant life is present in the stream." We are unable to find any legal authority, regulation, statute, or otherwise (and Northwest draws our attention to none) that requires the MDE to perform a separate and discrete biological assessment of a body of water before issuing a discharge permit. As explained *supra*, in assigning use designations to each body of water in Maryland, the MDE evaluates the biological, chemical, and physical data compiled for the body of water. COMAR § 26.08.02.07. Therefore, in the instant case, the MDE completed its biological assessment of the intermittent stream when it designated that body of water (along with the Jones Falls and its tributaries) as Use III. To require the MDE to perform an additional biological survey before issuing a discharge permit would be duplicative as well as burdensome on the NPDES permit process.[24]

■ Fourth, Northwest suggests that, based on the EPA's Ambient Aquatic Life Water Quality Criteria for Ammonia (EPA Guidelines),[25] "the proposed weekly average concentration for ammonia [set forth in Villa Julie's discharge permit as ammonia nitrogen] is *not* more stringent than those levels necessary to protect the biological community in the intermittent stream." The EPA Guidelines set one-hour and four-day average concentrations for ammonia, which the EPA recom-

---

24. Moreover, pursuant to COMAR § 26.01.02.28.B(2), the burden of persuasion is on Northwest, and it has provided no evidence that an additional biological assessment of the intermittent stream was necessary.

25. The EPA Guidelines were published pursuant to section 304(a)(1) of the Clean Water Act of 1977, 33 U.S.C. §§ 1251 *et seq.*

mends should not be exceeded any more than once every three years. Northwest contends that, under the parameters set out by the MDE in Villa Julie's NPDES discharge permit,[26] the weekly average concentration for ammonia, i.e., 1.5 mg/l, exceeds the four-day average concentration for ammonia (for a pH level of 6.5 to 8.75) permitted under the EPA Guidelines, i.e., 1.23 mg/l.[27]

Appellees, on the other hand, contend that the EPA Guidelines are national criteria recommendations that are not binding on Maryland. Appellees explain that, "[i]n addition to the EPA [Guidelines], States may use any other scientifically defensible guidance material including the State's own monitoring and sampling data and additional published studies and articles on the effects of the pollutant."

The Foreword to the EPA Guidelines states that the criteria contained therein were promulgated as "[g]uidelines to assist the States in the modification of criteria presented in this document, in the development of water quality standards, and in other water-related programs." Maryland, however, has declined to adopt the ammonia criteria set forth in the EPA Guidelines. *See* COMAR § 26.08.02.03–3. Indeed, Maryland has no water quality standard for ammonia. *See* Md.Code Ann., Envir. § 9–314(a) ("[t]he [MDE] *may* adopt rules and regulations that set, for the waters of this State, water quality standards and effluent standards" (emphasis added)). There is nothing in the statutory provisions or elsewhere that requires the MDE to set effluent limitations for ammonia in a NPDES discharge permit. In fact, section 9–314(a) specifically allows for the agency to decide against setting such a standard. As explained in *Howard County, supra,* "The laws of Maryland do not require effluent standards for every discharge, nor do they require the use of every control strate-

---

**26.** The MDE designed Villa Julie's discharge permit with the following parameters: average water temperature—20 degrees celsius; permitted range of pH for the discharge—6.5 to 7.8.

**27.** These calculations assume a discharge into the intermittent stream of 1.5 mg/l of ammonia each day for a period of seven days.

gy to abate the evils of pollution."[28] *Howard County,* 72 Md.App. at 42, 527 A.2d 772.

As explained *supra,* the MDE's failure to express ammonia limitations in daily maximums was not in contravention of state and federal law. Therefore, we need only determine whether there is substantial evidence in the record to support the MDE's conclusion that its proposed ammonia limitations, expressed as ammonia nitrogen, are sufficient to protect the water quality of the intermittent stream, its biological community, and the public health. We hold that such substantial evidence exists.

Steven Lewis Luckman, Chief of the Municipal Permits Division of the MDE, testified as an expert in stream water quality standards and water quality monitoring. He opined that the effluent limitations proposed in Villa Julie's NPDES discharge permit were sufficient to meet both state and federal guidelines, to protect the Jones Falls, to protect the biological community of the intermittent stream, and to protect the public health.

Dr. F. Pierce Linaweaver opined that the effluent limitations in the proposed permit were sufficient to protect the biological community in the intermittent stream and to maintain water quality standards in the Jones Falls. He also testified that Villa Julie's proposed waste water treatment plant would be able to meet those limitations.

Only Richard D. Klein, a technician with the Department of Natural Resources, testified that "the ammonia level [in Villa Julie's discharge permit] is set too high to protect the biological community of the intermittent stream and the biological community of the Jones Falls." These assumptions, however,

---

**28.** MDE calculated ammonia limitations for the Villa Julie permit to ensure that the ammonia in the effluent would not cause the intermittent stream to exceed its dissolved oxygen criteria, which is expressly set out in COMAR § 26.08.02.03–3.D(2). MDE determined that ammonia concentration should be limited to 1.0 mg/l (indicated as N in the permit) as a monthly average in order to maintain the dissolved oxygen in the intermittent stream at 6.0 mg/l.

were based upon the calculations set forth in the EPA Guidelines. Mr. Klein acknowledged that if the MDE lowered the pH levels (i.e., more acidic) in the effluent limitations, "that would reduce the potential impact of the ammonia upon the intermittent stream." In fact, Villa Julie and the MDE agreed to amend the pH standard from 6.5–8.7 to 6.5–7.8. *See supra* note 26.

Notwithstanding Mr. Klein's equivocal opinion to the contrary, the testimony of Dr. Linaweaver and Mr. Luckman provided substantial evidence for the MDE's conclusion that the effluent limitations set forth in Villa Julie's permit are sufficient to maintain the water quality standards of the intermittent stream, protect its biological community, and protect the public health.

## III.

 Pursuant to COMAR § 26.08.02.05–1.A, "[d]ischarges to intermittent streams are not permitted when feasible alternatives are available." Northwest argues that, in the case *sub judice,* holding tanks and spray irrigation were available as feasible alternatives to the discharge from Villa Julie's proposed waste water treatment plant into the intermittent stream. Therefore, contends Northwest, the MDE erred in issuing the NPDES discharge permit to Villa Julie. As the question of whether feasible alternatives to Villa Julie's proposed discharge into the intermittent stream was a question of fact before the MDE, we need only determine whether the MDE's conclusion that no feasible alternatives existed is supported by substantial evidence in the record. We hold that such substantial evidence exists.

Mr. Bauer stated that Villa Julie's septic system had failed and that the use of an intermittent stream for discharge of treated waste water was a choice of last resort. Mr. Bauer explained that Villa Julie's current waste removal procedure, namely the "pump and haul" method, is not a long-term solution for waste water problems because it is problematic and cost prohibitive.

George Neff, as spokesman for Baltimore County with respect to the proposed waste water treatment plant at Villa Julie, confirmed that the use of holding tanks and the hauling of excess discharge is a temporary and short-term solution to Villa Julie's failed septic system. In addition, Mr. Neff testified that Baltimore County does not authorize "pump and haul" as a permanent or long-term solution to the disposal of waste water.

Furthermore, COMAR § 26.04.02.03.B expressly prohibits the use of holding tanks at Villa Julie. That section provides, in pertinent part:

Holding tanks may be used to resolve existing on-site sewage disposal failures when the community sewer facilities are not available or on-site repair is not possible. They may not be permitted to serve new construction or for the purpose of adding capacity to an existing disposal system in order to accommodate a change in property use.

Villa Julie is currently seeking a special exception to accommodate its anticipated expansion, including the construction of a new academic building and a private waste water treatment plant. (Villa Julie is currently a lawful nonconforming use in the RC–2 zone.) As COMAR § 26.04.02.03.B expressly prohibits the use of holding tanks "to serve new construction or for the purpose of adding capacity to an existing disposal system in order to accommodate a change in property use," the MDE could not have concluded that the proposed use of holding tanks could have been a feasible alternative to Villa Julie's proposed discharge into the intermittent stream.

A spray irrigation system was also rejected by the MDE as a feasible alternative to Villa Julie's proposed discharge into the intermittent stream. Mr. Bauer testified that spray irrigation would require a substantial lagoon so that storage capacity would exist during inclement weather and other times when spraying would be impracticable. He explained that the size of the storage lagoon for Villa Julie would have to be approximately two acres wide in area and approximately five feet deep. In addition, Villa Julie would have to provide an

adequate buffer zone from the irrigation and lagoon areas to protect its students. Finally, it was estimated that spray irrigation would only be able to accommodate a maximum of 27,000 gallons of waste water per day, whereas Villa Julie currently generated between 27,000 and 30,000 gallons per day.[29] Mr. Bauer concluded that spray irrigation was not a feasible alternative to discharge into the intermittent stream.

The only evidence offered by Northwest to support its contention that spray irrigation was a feasible alternative to the proposed discharge into the intermittent stream was a letter from Dr. Ching–Tzone Tien, Division of Residential Sanitation, to J. James Dieter, Baltimore County Department of Environmental Protection and Resource Management. In that letter, Dr. Tien identified an area "with potential for spray irrigation" estimated at 10.2 acres. Dr. Tien concluded, however, as follows:

> In summary of the feasibility of employing spray irrigation for this facility, the area identified with potential for spray irrigation is estimated at 10.2 acres. The capacity of this area is estimated at 26,600 gpd using our recommended 1"/week application rate and 6–day storage time. This 26,600 gpd capacity is well below the estimated flow volume of 42,000 gpd to be used for designing sewage treatment and disposal for the existing Villa Julie College facilities.

It appears, therefore, that even Dr. Tien acknowledged that spray irrigation would not be a feasible alternative, as its "capacity is well below the estimated flow volume ... to be used for designing sewage treatment and disposal for the existing Villa Julie College facilities."

In light of the testimony of Mr. Bauer and Mr. Neff, and the conclusions of Dr. Tien, we hold that there was substantial evidence to support the MDE's conclusion that holding tanks and spray irrigation were not feasible alternatives to Villa Julie's proposed discharge into the intermittent stream.

---

29. In addition, Villa Julie has received zoning approval for discharge capacity up to 50,000 gallons per day.

## IV.

COMAR § 26.08.04.02.A(1)(d) provides that the "proposed discharge specified in the application . . . will be in compliance with all applicable requirements of . . . Federal and State law or regulation." Northwest argues that, because Villa Julie's proposed discharge into the intermittent stream "violates Northwest's private property interests and riparian rights," it does not comply with all applicable requirements of state law and regulation. *See id.*

Appellees, as a threshold issue, suggest that Northwest has failed to preserve this argument for our review. Appellees contend that, because Northwest failed to file exceptions to ALJ Wagner's grant of appellees' motion to dismiss the riparian rights issue, Northwest "failed to exhaust its administrative remedies as to this issue." The record indicates the contrary.

In a letter to Timmerman T. Daugherty, Esquire, Director of the Office of Community Assistance, MDE, dated 14 April 1993 and captioned "Exceptions to Proposed Decision," Michael J. Collins, Esquire, counsel for Northwest, stated, "The proposed discharge from the plant is a violation of Northwest Land's riparian rights." Indeed, the circuit court specifically commented, without objection from appellees' counsel,[30] on Northwest's riparian rights claim:

> I will comment for the record, Mr. Collins argued in his brief and, again reiterated today, the issue of the riparian's [sic] rights issue. That issue is not foreclosed by the decision of the Court today but certainly can be entertained and, in a correct forum of this Court, which is not this case.

Notwithstanding appellees' protestations to the contrary, it is clear that Northwest excepted to ALJ Wagner's dismissal of

---

**30.** To the extent appellees' maintain that, notwithstanding the circuit court's pronouncement, the riparian rights claim was waived by Northwest's failure to raise it before the MDE, we note that appellees' failed to raise such a waiver argument before the circuit court, and therefore may be perceived to have waived their waiver argument.

its riparian rights claim, and carried forward that argument to the circuit court, thereby exhausting its administrative remedies. The issue was therefore properly preserved for our review.

■ As to the merits of Northwest's claim, however, we agree with the circuit court and are persuaded by a decision of the Missouri Court of Appeals, *Curdt v. Missouri Clean Water Comm'n*, 586 S.W.2d 58 (Mo.Ct.App.1979), which similarly rejected an attempt by adjacent landowners to interject a riparian rights claim into a discharge permit proceeding. In that case, the discharger applied to the Missouri Clean Water Commission (Commission) for a permit to discharge its treated effluent from a purification lagoon into a surface watercourse on the discharger's property. The watercourse continued from the discharger's property into a pond on adjacent landowners' property. The adjacent landowners challenged the permit, arguing that its riparian rights were violated by the flow of the discharged water onto its property.

The Commission refused to consider the riparian rights claim in the discharge permit proceeding, and the Missouri Court of Appeals agreed. The Court explained:

The statutory provisions of the Missouri Clean Water Law do not explicitly grant the Commission the power to determine riparian rights. Moreover, these provisions do not impliedly grant this power. For example, a clarification of the respective rights and duties of a lagoon owner and an adjacent property owner would not affect, and, thus could not facilitate the Commission's required determination of whether the discharged water meets the statutorily defined effluent limitations and water quality standards. Furthermore, determination of the riparian rights of individual landowners would not reveal what impact the discharge would have on water quality and, thus, could not serve to insure minimum water quality degradation in this state.

*Id.* at 60.

The Court recognized, however, that the adjacent landowners' existing rights, including their riparian rights, are not

abridged by the issuance of a permit, as indicated in Mo.Rev. Stat. § 204.131 (1973).[31] *Curdt,* 586 S.W.2d at 60. The Court held that the adjacent landowners "misconceive the legal effect of the clean water permit. This permit merely reflects full compliance with the clean water standards imposed by the Missouri Clean Water Law." *Id.* If a discharger is indeed violating adjacent landowners' riparian rights, that discharger is not absolved from liability by its clean water permit. *Id.* The proper forum for the landowners' action, however, is the courts, and not an administrative discharge permit proceeding. *Id.*

 The MDE, similar to the Commission in *Curdt,* is an administrative agency charged with managing, improving, controlling, and conserving the waters of Maryland. *See Howard County,* 72 Md.App. at 23, 527 A.2d 772. Like other administrative agencies, the MDE has only those powers that the legislature has expressly or impliedly conferred. *Mayor & Aldermen of the City of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 394, 396 A.2d 1080 (1979); *Dal Maso v. Board of County Comm'rs,* 182 Md. 200, 205, 34 A.2d 464 (1943). The MDE is neither expressly nor impliedly authorized to determine the rights of individual property owners. *See* Md.Code Ann., Envir. § 9–302, 9–324. As in *Curdt,* specific recognition that Northwest's existing riparian rights are not abridged by the issuance of a discharge permit is found in Md.Code Ann., Envir. § 9–303 (1993 Replacement Volume). That section provides: "This subtitle does not take away the right of any person, as a riparian owner or otherwise, in equity, at common law, or under statutory law to suppress a nuisance or abate pollution." *Id.*

---

**31.** Section 204.131 provides:

Nothing in sections 204.006 to 204.141 alters or abridges any right of action now or hereafter existing in law or equity civil or criminal, nor is any provision of sections 204.006 to 204.141 construed as prohibiting any person, as a riparian owner or otherwise, from exercising his rights to suppress nuisances.

Mo.Rev.Stat. § 204.131 (1973).

Thus, if Villa Julie's proposed discharge indeed does, some-time in the future, violate Northwest's riparian rights, Villa Julie is not absolved from liability by its discharge permit. Northwest's relief, if any, is in the courts. Consequently, the MDE had no authority to entertain, and properly refused to consider, this private dispute raised by Northwest, a third party to the permit proceeding. *Cf. Maryland Action for Foster Children, Inc. v. State,* 279 Md. 133, 138–139, 367 A.2d 491 (1977) (mandamus will not lie to control the exercise of discretion by a public official); *Glen Burnie Improvement Ass'n v. State Appeal Bd.,* 213 Md. 407, 411–12, 132 A.2d 451 (1957) (same).

Interestingly, Northwest concedes in its reply brief that the MDE "does not have the authority to resolve riparian rights issues." It claims, however, that the MDE "is required under COMAR § 26.08.04.02.A(1)(d) to determine that the discharge will comply with applicable State and federal law," and the MDE's failure to consider the riparian rights of Northwest and others was "arbitrary and capricious." We are unable to discern a meaningful difference between Northwest's claim in its brief (that because Villa Julie's proposed discharge into the intermittent stream "violates Northwest's private property interests and riparian rights," the proposed discharge speci-fied in the application does not comply with all applicable requirements of state law and regulation) and its apparently refined argument in its reply brief (that the MDE must consider the riparian rights of Villa Julie's downstream neigh-bors to determine whether the proposed discharge complies with state law and regulations). In order for the MDE to determine, under Northwest's theory, whether the proposed discharge complies with state law and regulations, it must make an independent determination as to whether the pro-posed discharge will violate Northwest's riparian rights. As we hold *supra,* the MDE is not vested with the authority to make such a determination and, therefore, the riparian rights of adjacent landowners are not applicable regulatory or legal considerations in determining whether the proposed discharge

complies with federal or state law or regulations under CO-MAR § 26.08.04.02.A(1)(d).

## V.

██ Finally, Northwest contends that Md.Code Ann., Envir. § 9–222 (1993 Replacement Volume) gives "the MDE authority to correct a failing sewage system by ordering a County, such as Baltimore County in this case, to extend public sewer to correct a failing sewerage system which '[c]auses a condition by which any of the waters of this state are being polluted or could become polluted in a way that is dangerous to health or is a nuisance.'" As Villa Julie's septic system has failed, Northwest contends that, of the 27,000 gallons per day of sewerage currently generated by Villa Julie, approximately 19,000 [32] gallons per day is flowing directly into the water table; the other 8000 gallons per day is hauled away by truck. Therefore, concludes Northwest, "Villa Julie is polluting the waters of the State in a way that is 'dangerous to health and [is] a nuisance.'" Appellees, on the other hand, argue that section 9–222 is discretionary, and the "MDE cannot be required to order Baltimore County to extend the public sewer in this case."

Section 9–222(a) provides:

(a) *Findings by Secretary that justify order.*—The Secretary may issue an order under subsection (b) of this section, if, after investigation, the Secretary determines that the absence or incompleteness of a public water supply system, public sewerage system, or refuse disposal system in a county, municipal corporation, sanitary district, subdivision, or locality:

---

**32.** Although Northwest claims in its brief that approximately 20,000 gallons per day of untreated waste water is currently flowing into the water table at Villa Julie, our reconciliation of the numbers suggests that Villa Julie is currently generating approximately 27,000 gallons per day of waste water and is hauling away approximately 8000 gallons per day: 27,000–8000 = 19,000.

(1) Is sufficiently prejudicial to the health or comfort of that or any other county, municipal corporation, sanitary district, subdivision, or locality; or

(2) Causes a condition by which any of the waters of this State are being polluted or could become polluted in a way that is dangerous to health or is a nuisance.

*Id.* "This grant of authority is independent of MDE's authority to issue permits and enables MDE to move immediately when necessary to protect the public interest in a healthful environment." 78 Op.Att'y Gen. 273, 278 (8 November 1993). An order under this section must be based on a finding that the absence or incompleteness of a public sewerage system is sufficiently prejudicial to the health or comfort of the county, or causes a condition by which waters of Maryland are polluted in a way that is dangerous to health or is a nuisance.

In the case *sub judice*, there is no evidence in the record indicating that the absence of a public sewerage system at Villa Julie creates a nuisance or menace to health, or any danger of water pollution. Although Northwest baldly asserts in its brief that approximately 19,000 gallons per day of untreated waste water is flowing directly into the water table at Villa Julie, it points to no evidence in the record, and we are unable to find any, that such pollution is occurring. There is also no evidence in the record that MES or the MDE, in their environmental studies of the Villa Julie sewage problem, found the level of pollution or the health dangers alleged by Northwest to exist at Villa Julie. Accordingly, the MDE cannot be found to have abused its discretion by not making such findings and not ordering the extension of a public sewerage system to Villa Julie. *Accord Wincamp Partnership v. Anne Arundel County,* 458 F.Supp. 1009, 1022–23 (D.Md.1978) (interpreting the predecessor statute to section 9–222); *cf.* 78 Op.Att'y Gen. at 278 ("Attorney General's Office cannot second-guess technical judgments made by MDE, which has the presumed expertise to make the judgment called for EN § 9–222(a)"); *see generally* 76 Op.Att'y Gen. 11 (23 January 1991).

JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.