REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2199

September Term, 2013

_____

MARYLAND DEPARTMENT
OF THE ENVIRONMENT, ET AL.

v.

ANACOSTIA RIVERKEEPER, ET AL.

_____

Nazarian,
Leahy,
Friedman,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: April 2, 2015

TABLE OF CONTENTS

I. BACKGROUND........................................................................................................1

    A.   Statutory Background. ....................................................................................3

        1.   The Clean Water Act and federal permit requirements......................3

        2.   The role of the States and Maryland's permit requirements. ...........7

    B.   The Permit. ..................................................................................................10

    C.   The Proceedings. .........................................................................................12

II. DISCUSSION ........................................................................................................14

    A.   Standard of Review. ....................................................................................16

    B.   The Permit Is Subject To § 1342, Not § 1311...........................................18

    C.   The Permit Does Not Comply With State Law Regarding
         The Permitting Process..............................................................................23

        1.   The Permit does not give meaningful opportunity for
            notice and comment, and eludes judicial review..............................24

            a.   The Environment Article requires that the public have
                an opportunity for notice and comment. .......................................24

            b.   Specific shortcomings of the  Permit ...........................................26

               i.   The public can't comment about decisions that have yet to be made.......26

               ii.   The Permit is not specific enough. ...........................................28

               iii.   The Permit overrelies on incorporation by reference. ...............30

               iv.   The Permit contains no meaningful deadlines or ways to measure
                  compliance..................................................................................33

        2.   The agency decision to issue the Permit was unsupported by
            substantial evidence with respect to TMDLs and the twenty percent
            requirement..........................................................................................35

            a.   The twenty percent requirement.................................................35

            b.   The TMDL requirement. ...........................................................38

This case arises out of protracted litigation over the terms of the stormwater management permit (the "Permit") that the Maryland Department of the Environment ("the Department") issued to Montgomery County (the "County") in 2010. The County and Department appeal the decision of the Circuit Court for Montgomery County remanding the Permit to the Department "for further proceedings to allow the agency to comply with Maryland law, the Clean Water Act, and federal regulations consistent with" the court's interpretation of the governing law and regulations. We agree that the Permit must be revised, and so we affirm the circuit court's decision to remand. Importantly, though, we hold that the Department and the County had the law right: the Permit falls short not for failing to hold the County to State water quality standards, as the challengers urge,[1] but because it did not afford an appropriate opportunity for public notice and comment and because it lacks crucial details that would explain the County's stormwater management obligations.

## I. BACKGROUND

Stormwater is what the word suggests: water from rain- or other storm events that, as it (over)flows into streams and rivers, picks up and carries large quantities of pollutants that evade Mother Nature's filtration process. The pollutants can include anything from

---

[1] The challengers include Anacostia Riverkeeper and other self-described "local and regional environmental groups dedicated to restoring and protecting waters that flow through Montgomery County," who challenged the Permit based on a number of concerns including those we will describe below.

road detritus—trash, road salts, grease, and other materials from cars—to pesticides, to natural materials, such as fecal bacteria from animal waste.

The County collects stormwater through a municipal separate storm sewer system (the County's is big enough to qualify as an "MS4," a term we will define later) that covers a nearly-500-square-mile area. After it falls from the sky, stormwater flows, in higher volumes and at higher speeds, through natural outfalls or through the County's sewer pipes and wastewater treatment facilities, then into the Middle Potomac and Patuxent River basins. Everyone agrees that this is bad for the rivers: in its comments during the Permit application process, the Department recognized that interested parties saw stormwater as "the '. . . biggest form of pollution affecting the Anacostia River. . .' carrying trash and accumulated pollutants and causing flooding in low-lying areas of various watersheds throughout the County. . . . It becomes fairly easy for all organizations, individuals, and government agencies to agree that urban stormwater is a problem that must be addressed." And just as everything else in life flows downhill, the pollution (and corresponding degradation of water quality) flows downstream into the waters of the District of Columbia and Prince George's County, and eventually into the Chesapeake Bay.

The Clean Water Act (the "Act"), along with its Maryland counterpart and overlapping layers of regulations,[2] regulates and seeks to limit water pollution from

---

[2] Despite our best efforts to avoid jargon and acronyms, the Act, its state law counterpart, and the various regulations rely on them in abundance. Fortunately, the law, the parties, and the record all seem to use terms consistently, and we will follow suit.

stormwater runoff into municipal sewer systems that discharge into rivers. This case involves a successful challenge to the terms of the stormwater permit the Department issued to the County in 2010. We begin by discussing the statutory requirements, then walk through the process the County went through with the Department to obtain the Permit, then summarize the proceedings that culminated in this appeal.

### A. Statutory Background.

#### 1. The Clean Water Act and federal permit requirements.

The Act was passed in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a). The Act presumptively prohibits the discharge of pollutants, *id.* § 1251(a)(1), and renders any discharge unlawful, *id.* § 1311(a), unless the discharging party obtains a permit under the "National Pollutant Discharge Elimination System" ("NPDES"). *Id.* § 1342(a)(1).

As initially drafted, § 1311 limited the amount of pollutants that could enter the water from a particular source. The Act imposes "effluent limitations" on discharges from any "point source" (a term we will get to momentarily) by requiring the source to use "the best practicable control technology ["BPT"] currently available." 33 U.S.C. § 1311(b)(1)(A)(i). When first enacted, the Act required effluent limitations to be in place by July 1, 1977. *Id.* § 1311(b)(1)(A). Section 1311 also required compliance with any "*more stringent limitation*, including those necessary to meet water quality standards . . . established pursuant to any State law or regulations." *Id.* § 1311(b)(1)(C) (emphasis added); *see also Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1163 (9th Cir. 1999)

3

(noting too that "although the BPT requirement takes into account issues of practicability," the EPA nonetheless requires the level of controls necessary to "implement existing water quality standards" (quoting *Rybachek v. EPA*, 905 F.2d 1276, 1289 (9th Cir. 1990))).

At its inception, the Act directed its efforts primarily at the most obvious "point source" pollution. The term "point source" was defined within the Act in a technical way that aimed to capture a broad universe of potential pollution sources:

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C.A. § 1362(14); *see also* 40 C.F.R. § 122.2. The parties don't dispute that a sewage system like the County's qualifies as a network of point sources, but that point has not been altogether obvious since the Act came about. The Act did not purport initially to regulate stormwater discharge, and in fact exempted stormwater separate from industrial or commercial activity. *See Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369, 1372 n.5 (D.C. Cir. 1977) (citing 40 C.F.R. § 125.4 (1975)); *see also* Jeffrey G. Miller, *The Supreme Court's Water Pollution Jurisprudence: Is the Court All Wet?,* 24 Va. Envtl. L.J. 125, 131-32 (2005); *The Clean Water Act Handbook* at 167 (Mark A. Ryan ed. 2011) ("Stormwater runoff in the early days of the NPDES program was treated as a diffuse source of *nonpoint source pollution.* This may have seemed logical because most runoff cannot efficiently be controlled using the strict end-of-pipe effluent limitations that are

effective in regulating traditional industrial and municipal discharges." (emphasis added)).

But in 1987, Congress amended the Act to bring stormwater discharge specifically within its reach, and since then storm sewer discharge has been treated as a point source and covered by the NPDES permit requirements. *Natural Res. Def. Council v. EPA*, 966 F.2d 1292, 1296 & n.5 (9th Cir. 1992).[3] *See* 33 U.S.C. § 1342(p)(3)(B); *see also Browner*, 191 F.3d 1159. The amendments applied discharge limitations to MS4 systems that serve a population of 100,000 or more,[4] 33 U.S.C. § 1342(p)(2)(C), (D):

> *Permits* for discharges from municipal storm sewers . . . (iii) *shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices*, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

33 U.S.C. §1342(p)(3)(B) (emphasis added).

The Act also raises standards for permits where the "effluent limitations [imposed by § 1311] are not stringent enough to implement any water quality standard applicable to

---

[3] The amendments came about in part because of a 1977 court decision that held that the EPA lacked the authority to exempt *any* particular category of point source (such as MS4s) from the Act's reach. *See Natural Res. Def. Council v. Costle*, 568 F.2d 1369, 1379 (D.C. Cir. 1977) ("[T]he existence of uniform national effluent limitations is not a necessary precondition for incorporating into the NPDES program pollution from . . . storm water runoff point sources. The technological or administrative infeasibility of such limitations may result in adjustments in the permit programs, . . . but it does not authorize the Administrator to exclude the relevant point source from the NPDES program.").

[4] The County's system here falls within that description.

such waters." *Id.* § 1313(d). A state must establish a total maximum daily load ("TMDL") for those pollutants that keep it from meeting water quality standards; the TMDL "is the sum of pollutants a body of water can absorb from all point and non-point sources, plus a margin of safety, and still meet water quality standards for its designated uses." *Assateague Coastkeeper v. Maryland Dep't of the Env.*, 200 Md. App. 665, 675 n.8 (2011). So, for example, the EPA has issued a TMDL for the Chesapeake Bay that applies expressly to this Permit, in addition to other local TMDLs. As the Chesapeake Bay Foundation explains it,[5] "Maryland's ability to comply with the Bay TMDL pollution reduction requirements relies heavily on reducing pollutants from urban stormwater," and "*the ability to track and confirm progress*" on that reduction "through public participation, monitoring, and setting and using interim benchmarks *is of the utmost importance*" (emphasis added).

The "maximum extent practicable" language in § 1342 leaves altogether unclear, though, who *deems* a measure maximally practicable. And although that concept differs from the prior standard, and relieves municipal systems of the burden to meet specific water quality standards (a burden that still applies to private sources), it leaves open whether MS4s also must comply with the "effluent limitations" (and concomitant BPT standard) in § 1311. Add to this mix the state environmental regulations we discuss next, and the picture (like the water) becomes murkier.

---

[5] The Foundation sought permission to file an *amicus curiae* brief and we granted its request on August 15, 2014.

## 2. The role of the States and Maryland's permit requirements.

The Act recognizes the "responsibilities and rights" of the various states to respond to System requirements, *id.* § 1251(b), and the EPA has delegated to Maryland the right to issue permits, *see Assateague Coastkeeper*, 200 Md. App. at 677-78 n.10, a task that it in turn has delegated to the Department. The Environment Article to the Maryland Code declares pollution to be "a menace to public health and welfare," and declares the State's policies regarding water pollution and water quality:

> (1) To improve, conserve, and manage the quality of the waters of this State;
>
> (2) To protect, maintain, and improve the quality of water for public supplies, propagation of wildlife, fish, and aquatic life, and domestic, agricultural, industrial, recreational, and other legitimate beneficial uses;
>
> (3) To provide that no waste is discharged into any waters of this State without first receiving necessary treatment or other corrective action to protect the legitimate beneficial uses of the waters of this State;
>
> (4) Through innovative and alternative methods of waste and wastewater treatment, to provide and promote prevention, abatement, and control of new or existing water pollution; and
>
> (5) To promote and encourage the use of reclaimed water in order to conserve water supplies, facilitate the indirect recharge of groundwater, and develop an alternative to discharging wastewater effluent to surface waters, thus pursuing the goal of the Clean Water Act to end the discharge of pollutants and meet the nutrient reduction goals of the Chesapeake Bay Agreement.

Md. Code (1996, 2007 Repl. Vol.), § 9-302(b) of the Environment Article ("Envir.").  Like

the Act, Maryland law prohibits discharges generally (providing that "a person may not

discharge any pollutant into the waters of this State," *id.* § 9-322), but allows for a discharge

permit to issue from the Department, *id.* § 9-323, and specifies both what a permit must

contain and how it must be obtained:

> (a) Subject to the provisions of this section, the Department may issue a discharge permit if the Department finds that the discharge meets:
>
> (1) *All applicable State and federal water quality standards and effluent limitations*; and
>
> (2) All other requirements of this subtitle.
>
> * * *
>
> (d) The Department shall give public notice of each application for a discharge permit as required by Title 1, Subtitle 6 of this article, and *by making available to the public appropriate documents, permit applications, supporting material, plans, and other relevant information*.

*Id.* § 9-324 (emphasis added).

The statute also allows the Department to "adopt rules and regulations that set, for

the waters of this State, water quality standards and effluent standards":

> (a)    These standards shall be designed to protect:
>
> (1) The public health, safety, and welfare;
>
> (2) Present and future use of the waters of this State for public water supply;
>
> (3) The propagation of aquatic life and wildlife;

8

(4) Recreational use of the waters of this State; and

(5) Agricultural, industrial, and other legitimate uses of the waters of this State.

(b) *The rules and regulations adopted under this section shall include at least the following*:

(1) *Water quality standards* that specify the maximum permissible short term and long term concentrations of pollutants in the water, the minimum permissible concentrations of dissolved oxygen and other desirable matter in the water, and the temperature range for the water.

(2) *Effluent standards* that specify the maximum loading or concentrations and the physical, thermal, chemical, biological, and radioactive properties of wastes that may be discharged into the waters of this State.

* * *

(c) *Effluent standards set under this section shall be at least as stringent as those specified by the National Pollutant Discharge Elimination System.*

*Id.* § 9-314 (emphasis added).

This background establishes the simple premise that federal and state laws and regulations limit a county or other governmental entity from letting stormwater runoff go unchecked into our waters, and give that entity the flexibility to devise maximally practicable measures to deal with the problem. Turning that seemingly straightforward anti-pollution premise into real-life permits, however, is a challenging task.

9

**B.     The Permit.**

In 1996, the Department issued the County its first municipal separate storm sewerage system ("MS4") permit, for a five-year term.  The permit reissued in 2001 and at least once after.[6] In 2009, after the renewal application process for the most recent permit was underway, the Department recognized the need for strict monitoring of stormwater discharge.  In its response to comments to the proposed permit, the Department stated that the new Permit would require the County to intensify its efforts, that it would

> force [the County] to make major strides toward controlling urban runoff better than ever before.  New conditions such as . . . requiring an additional twenty percent of the County's impervious area to be restored are major additions. Additionally, a firm commitment for TMDL implementation according to the plan that the County is required to develop within one year of permit issuance is the strongest evidence yet of what MDE believes will move these programs forward toward the ultimate goal of meeting water quality standards.

This response came after public comment on a "tentative determination to issue permit" that the Department had issued in September 2008. The appellees filed timely comments on December 1, 2008, and complained (among other arguments) that the draft permit did not include enforceable language or deadlines, did not link in a meaningful way to water quality standards or TMDLs, did not allow for meaningful public participation or

---

[6] The Department states in its brief that the Permit was reissued in 2006 as well.  Anacostia disagrees, although it claims (without citing any authority) that the renewal took place in 2010, "more than three years *after* it was scheduled to expire."  (Emphasis added.) This dispute doesn't matter to our analysis.

review of the County Stormwater Management Program, and lacked adequate monitoring and reporting requirements. After receiving additional comments from other interested parties, the Department issued a notice of final determination to issue the Permit (the "Notice") on March 4, 2009 without substantial changes, and it issued the Permit itself on February 16, 2010, for a five-year period that expired on February 15, 2015.[7]

The final Permit specifically required the County to "implement or install best management practices on twenty percent of the impervious surfaces within the County in an effort to restore the pollution reduction functions performed by undeveloped land," which in turn required the County to submit "a long-term schedule for the completion of detailed assessments of each watershed in the County." (This requirement comes into play below, we will refer to it from here as the "twenty percent requirement"). The Permit calls for pollution controls that include implementation of "management programs . . . designed to control stormwater discharges to the maximum extent practicable." And the stormwater

---

[7] We asked at oral argument whether this appeal would be moot if this litigation weren't resolved by the Permit's then-impending (and now past) expiration date. The Department responded, and we are comfortable, that the disputes remain live after February 15 for two reasons. *First*, as we discuss in detail below, the Permit requires that "the County must *submit* an implementation plan for complying with the requirement for [twenty] percent restoration within the 5-year term of the [P]ermit" (emphasis added), but does not seem expressly to require that the plan be *executed* fully by then, so it is still subject to revision after it nominally expires. *Second*, the Department advised us that the application for the succeeding permit had not yet begun at the time of argument, that the process (including notice and comment periods) for a new permit could not be completed before this one expired, and that the terms of the existing Permit would remain in place until superseded.

management program requires that the County, at a minimum, "[c]onduct preventative maintenance" by inspecting "all stormwater management facilities at least on a triennial basis"; "[i]mplement the stormwater management design policies, principles, methods, and practices found in the *2000 Maryland Stormwater Design Manual*" (the "Manual"); and "[m]aintain programmatic and implementation information according to the requirements established as part of [the Department's] triennial stormwater program review."

### C.    The Proceedings.

This case began not with the current appeal, but an earlier one. After the Department filed the Notice, Anacostia requested a contested case hearing on March 18, 2009. (At the time, Envir. § 1-605(a) allowed for a contested case proceeding.) An administrative law judge ("ALJ") concluded that Anacostia lacked standing to challenge the Permit because it had no special interest to protect beyond that of the general public. Anacostia sought judicial review in July 2009 in the Circuit Court for Baltimore County, which later transferred the case to the Circuit Court for Montgomery County. That court upheld the ALJ's decision, but we reversed, holding that Anacostia did in fact have standing, and we remanded for consideration of the underlying substantive issues. *Anacostia Riverkeeper v. Md. Dep't of the Envir.,* Sept. Term 2011, No. 2107 (filed January 7, 2013) ("*Anacostia I*"), slip op. at 22.

Round Two took a slightly different path because in 2009, the General Assembly changed the procedures for challenging a permit. Section 1-601 of the Environment Article now allows direct judicial review of agency permitting decisions. (It also broadens the

12

class of people who can bring such a challenge, and formed part of our basis for reversing the ALJ's decision in *Anacostia I*. *See Anacostia I*, slip op. at 20.) So once we remanded *Anacostia I*, the circuit court took the case directly and held a hearing on the merits on November 20, 2013 (the "Hearing"). Anacostia argued there that the Permit failed to require compliance with Maryland's water quality standards or applicable TMDLs, and that by allowing for the specific development of so many implementation plans outside the four corners of the Permit, the Department allowed the Permit to escape meaningful public participation or judicial review.

The Department responded that the Permit contained all that it needed in requiring the County "to install best management practices" to restore twenty percent of impervious surfaces and meet certain wasteload allocations. It also argued that the policies and provisions of the Manual and the Maryland Stormwater Management Act of 2007 were properly referenced in the Permit.

The trial judge expressed frustration with the Department's position at the Hearing, both as to the vagueness of the term "best management practices" and the Permit's references to so many outside sources. The court ultimately held, both in a ruling from the bench and in a written order two weeks later, that the Permit had to comply with sections 1311 *and* 1342 of the Act, along with state law requirements under Envir. § 9-324, and that the Permit fell short of these standards (we omit the paragraph numbering):

> After reviewing the permit and the administrative record, the Court is unable to understand why [the Department] adopted the terms in the permit, or how those terms meet the

13

requirements of the law. The permit does not state with clarity what the permittees will do, how they are to do it, what standards apply, or how one will measure compliance or noncompliance. The permit lacks ascertainable metrics for meeting water quality standards that can either be met or not met.

The Court finds that it is not sufficient for the permit to require that permittees engage in best management practices and file annual reports on their activities. Manuals and policies that exist outside of the permit change frequently, and do not inform the public or the Court of what the permit specifically requires. While it is allowable for the permit to require best management practices, specific requirements for meeting water quality standards must be stated in the permit.

The Court finds that the permit's requirement to restore 20% of impervious surface is simply too general to show how the permittees will meet water quality standards. It does not explain what the permittee is to do or how its performance is to be measured.

Federal regulations require that the permit include a monitoring program for representative data collection for the term of the permit, including a program to monitor and control pollutants in storm water discharges from sites that are contributing a substantial pollutant loading. 40 C.F.R. § 122.26(d). The permit requires monitoring in one tributary, and requires the permittees to submit an annual report to MDE regarding all activities under the permit. The Court finds that these requirements are not sufficient to meet the applicable requirements for monitoring.

This timely appeal followed.

## II. DISCUSSION

This appeal presents one overarching question with numerous sub-questions that make it more complex: is the Permit legal? To answer the broader question, we analyze the

Permit's near-twenty-year history against the statutory and regulatory lattice. And perhaps counterintuitively, we find that the Department's expertise (which on review of agency decisions so often gives us reason to defer to an agency) and intimacy with the process and available technology may well be the Permit's undoing. There may be rational reasons for requiring the County to prepare plans after approval and incorporate outside materials into the Permit by reference. But those reasons are difficult to discern for anyone who did not live deeply in the weeds of negotiating and preparing it, and because many of the Permit's terms are structured as obligations to develop plans, they are insulated from effective review.

We hold *first* that Congress, by adding § 1342 the 1987 amendments to the Act, intended to treat MS4s differently and regulate them separately from, or in conjunction with, the existing requirements of § 1311. *Second,* we analyze what exactly the § 1342 "maximum extent practicable" and "best management practices" language requires of a state attempting to enforce environmental laws, and how state environmental regulations pick up on that language. That hardly ends the story, though: although we agree with the Department that Congress relieved it of the more stringent requirement of § 1311, we conclude *third* that this Permit effectively cuts off public commentary on important components by glossing important requirements and deadlines and incorporating outside sources in a manner that leaves the Permit's operative terms too difficult to find and know.

### A.     Standard of Review.

Our review of an agency decision is highly deferential. We look through the decision of the circuit court and use the same standard of review that the circuit court did. *Kim v. Maryland State Bd. of Physicians*, 423 Md. 523 (2011) (citing *People's Counsel for Baltimore County v. Surina*, 400 Md. 662, 681 (2007)). In a case like this, we review the agency decision at two levels: *first*, to determine whether the record contains substantial evidence to support the agency decision and *second*, to determine whether the decision is legally correct. *Najafi v. Motor Vehicle Admin.*, 418 Md. 164, 173 (2011) (citation omitted).

For reasons we will explain in Part II.B, we start with the second step—whether the Department was legally correct in its decision to issue the Permit. We are "under no constraints in reversing an administrative decision which is premised solely on an erroneous conclusion of law." *People's Counsel for Baltimore Cnty. v. Maryland Marine Mfg. Co.*, 316 Md. 491, 497 (1989); *see also HNS Dev., LLC v. People's Counsel for Baltimore Cnty.*, 425 Md. 436, 449 (2012). A reviewing court should respect "the expertise of an agency in its own field," *Board of Phys. Quality Assur. v. Banks*, 354 Md. 59, 69 (1999) (citations omitted), and the Department correctly points out that an agency's authority "may include a broad power to promulgate legislative-type rules or regulations" to assist in implementing applicable statutes. *Christ v. Dep't of Natural Res.*, 335 Md. 427, 445 (1994). Agencies "'are created in order to perform activities which the Legislature deems desirable and necessary to further the public health, safety, welfare, and morals,'"

16

and "'[t]he powers vested in the courts, by statute or inherence, to review administrative decisions does not carry with it the right to substitute its fact-finding process for that of an agency.'" *Northwest Land Corp. v. Maryland Dep't of Env.*, 104 Md. App. 471, 488 (1995) (quoting *Sec'y of Health & Mental Hygiene v. Crowder*, 43 Md. App. 276, 281 (1979)).

As to the substantial evidence component of our review, *Najafi* directs a generous level of deference:

> In applying the substantial evidence test, a reviewing court decides "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court "must review the agency's decision in the light most favorable to it; . . . the agency's decision is prima facie correct and presumed valid, and . . . it is the agency's province to resolve conflicting evidence" and to draw inferences from that evidence.

*Id.* at 173 (quoting *Maryland Aviation Admin v. Noland*, 386 Md. 556, 571-72 (2005)). And where an agency is acting within its discretion, we will overturn its decision only where we find that its action is arbitrary and capricious. *Md. Board of Phys. v. Elliott*, 170 Md. App. 369, 406 (2006); *see also* Md. Code (1984, 2009 Repl. Vol.), § 10-222(h)(3)(vi) of the State Government Article ("S.G."). But we owe no deference to an agency whose conclusions have gone unsupported "by competent and substantial evidence, or where the agency draws impermissible or unreasonable inferences and conclusions from undisputed evidence." *Stansbury v. Jones*, 372 Md. 172, 184 (2002); *see also Mayor and Aldermen of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 395 (1979) ("When reviewing

an administrative decision for arbitrariness or capriciousness, a court must first determine whether the question before the agency was fairly debatable," and if not it is not arbitrary and capricious.). For an issue to be "fairly debatable," "'the administrative agency overseeing the . . . decision must have "substantial evidence" on the record supporting its decision.'" *Mills v. Godlove*, 200 Md. App. 213, 224 (2011) (quoting *White v. North*, 356 Md. 31, 44 (1999)).

### B. The Permit Is Subject To § 1342, Not § 1311.

At the threshold, the parties dispute which of the various federal and state laws drive the requirements the Permit must fulfill. The Department argues that the Act does not require an MS4 to comply with the water quality standards articulated in § 1311 because the 1987 amendments replaced those standards "with the maximum-extent-practicable standard, and replaced numerical effluent limitations with 'management practices,' 'control techniques,' 'systems, design and engineering methods,' and other provisions that the State 'determines appropriate.'" Anacostia argues that the Permit continues to be subject to the technology-based limitations of § 1311 *in addition to* "any more stringent limitation necessary to assure compliance with water quality standards for the receiving waters." We disagree, and hold that the Permit is *not* subject to the technology-based discharge limitations ("TBDLs") of § 1311(a), but rather to § 1342(p)(3)(B), which in turn requires the County to adhere to the TMDL limits imposed by state law via § 1313(d)(1)(c).

When first passed in 1972, the Act regulated big municipal stormwater systems. With the benefit of hindsight, it appears that that approach was not practical for MS4s. We

18

agree with the Department that the 1987 amendments, and § 1342 in particular, imposed different and *alternative* standards on MS4s, standards that state broader principles rather than prescriptive requirements.

But although § 1342(p)(3)(B) imposed new requirements for MS4s that differed from the technology-based requirements of § 1311, the amendments did not state whether MS4 permits *also* had to comply with water quality standards under § 1311(b)(1)(C). In 1991, the EPA's General Counsel interpreted the "MEP" standard to modify the technology-based requirements of § 1311, but he did not believe that the MEP language displaced the general water quality standards imposed by § 1311. *See* Memorandum from E. Donald Elliott, Ass't Admin'or & General Counsel, EPA, to Nancy Marvel, Regional Counsel, January 9, 1991, "Compliance with Water Quality Standards in NPDES Permits Issued to Municipal Separate Storm Sewer Systems," 1991 W.L. 326640 (the "Elliott Memorandum") at *2.[8] Then, in 1996, the EPA issued a Notice outlining an "Interim Permitting Approach for Water Quality-Based Effluent Limitations in Storm Water

---

[8] It doesn't matter for our purposes whether the broader question raised by and answered in the Elliott Memorandum—whether the term "water quality standards" (which can be, but is not always, used as a term of art to describe specific standards) still applies with equal force to MS4s. Anacostia argued that the distinction between state and federal water quality standards is not material here, and we are inclined to agree. The Department is not arguing that the Permit need not attempt to *meet* TMDL requirements as part of broader water quality standards, but that the Permit adequately spells out how the County must do so, and by when.

19

Permits," 61 Fed. Reg. 43761-01 (Aug. 26, 1996), in which it likewise approved use of

BMPs while leaving room for improvement:

> The interim permitting approach uses best management practices (BMPs) in first-round storm water permits, and expanded or better-tailored BMPs in subsequent permits, where necessary, to provide for the attainment of water quality standards. In cases where adequate information exists to develop more specific conditions or limitations to meet water quality standards, these conditions or limitations are to be incorporated into storm water permits, as necessary and appropriate. *This interim permitting approach is not intended to affect those storm water permits that already include appropriately derived numeric water quality-based effluent limitations.*

*Id.* (emphasis added).

Several years later, the United States Court of Appeals for the Ninth Circuit held in

*Browner* that Congress intended § 1342(p)(3)(B) to treat MS4s *differently*—no longer to

require strict compliance with state water-quality standards (as industrial discharges had to

comply with under § 1311), but instead to impose the maximum-extent-practicable

standard. 191 F.3d at 1165. After reviewing the legislative history that culminated in the

1987 amendments, the Ninth Circuit held that § 1342(p)(3) specifically treats industrial

discharges differently from municipal discharges, and held the former to the more stringent

§ 1311 requirements. 191 F.3d at 1165 ("[I]ndustrial discharges must comply strictly with

state water quality standards."). Municipal discharges, on the other hand, lacked any such

requirement, and Congress instead imposed the MEP requirement in § 1342(p)(3)(B)(iii).

As such, the Ninth Circuit held, Congress intended in § 1342 to *not* require municipal stormwater discharges to comply with § 1311. 191 F.3d at 1165 ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation and internal quotation marks omitted))). The Court also noted that interpreting § 1342 to include the requirements of § 1311 would render § 1342 superfluous: because the latter is less strict, reading it to include § 1311's requirements would really just fold it into § 1311, "a result that we prefer to avoid so as to give effect to all provisions that Congress has enacted." 191 F.3d at 1165; *see also Koste v. Town of Oxford*, 431 Md. 14, 25-26 (2013) ("The primary goal of statutory construction is 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision[.]' In so doing, we look first to the 'normal, plain meaning of the language of the statute,' read as a whole so that '*no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory*[.]'" (citations omitted) (emphasis added)). Other courts have followed suit. *See, e.g.*, *Divers' Env'tal Cons. Org. v. State Water Resources Central Bd.*, 51 Cal. Rptr. 3d 497, 504 (2006) ("In regulating storm water permits the EPA has repeatedly expressed a preference for doing so by way of BMPs, rather than by way of imposing either technology-based or water quality-based

21

numeric limitations"[9]); *NRDC v. New York State Dep't of Env'tal Cons.*, 120 A.D.3d 1235 (2d App. Div. 2014) (assessing MEP standard as the appropriate one for municipal discharges); *Tualatin Riverkeepers v. Oregon Dep't of Env'tal Quality*, 230 P.3d 559, 564 n.10 (Ore. App. 2010) (citing *Defenders of Wildlife* with approval and noting the lesser MEP standard in § 1342 that applies to municipal stormwater discharges); *but see Building Indus. Ass'n of San Diego Cnty. v. State Water Resources Control Bd.*, 22 Cal Rptr. 3d 128, 141 (reading § 1342 not specifically to replace or not replace § 1311 as it related to municipal discharge, but seeing the significance of Congress adding the MEP language "to strengthen the [Act] by making its mandate correspond to the practical realities of municipal storm sewer regulation").

It falls to the Department, then, to translate these concepts into real-life permits. Over a decade ago, the EPA issued a memorandum (included here in the Department's record extract) designed to harmonize the BMP concept and the "maximum extent practicable" language. *See* November 22, 2002, Memorandum from Robert H. Wayland, III, Director, Office of Wetlands, Oceans and Watersheds, EPA, to Water Division Directors, Regions 1-10. This memorandum counseled in favor of "an iterative approach to control pollutants in storm water discharges," and recognized that "storm water discharges are due to storm events that are highly variable in frequency and duration and

---

[9] *Divers* also pointed to the relevant federal regulations as giving wiggle room to the states to apply BMPs when other approaches aren't feasible. *See id.* at 506-07 (quoting 40 C.F.R. § 122.44(k)).

are not easily characterized," therefore making it difficult to establish hard, numeric limits. In turn, it viewed BMPs as "an appropriate form of effluent limits" to control pollutants, *see* 40 CFR § 122.44(k)(2), (3).  But the EPA did not leave it at that—it stated its express expectation that agencies granting permits will ensure that BMPs are appropriately tailored:

> EPA expects that the NPDES permitting authority will review the information provided by the TMDL, *see* 40 C.F.R. § 122.44(d)(1)(vii)(B), and determine whether the effluent limit is appropriately expressed using a BMP approach (including an iterative BMP approach) or a numeric limit. Where BMPs are used, EPA recommends that the permit provide a mechanism to require use of expanded or better-tailored BMPs when monitoring demonstrates they are necessary to implement the WLA and protect water quality.

This guidance frames the issue here.  Although our analysis relieves the Department and the County of their obligations to comply with § 1311, the Permit cannot satisfy the alternative standard simply by parroting broad principles of best practices, especially given that State law applies as well.

### C.  The Permit Does Not Comply With State Law Regarding The Permitting Process.

Even under the standards imposed by § 1342, the Permit fails at two separate levels. *First*, it does not comply with the statutory procedural requirements of notice and public comment.  To be clear, the Permit might have complied from a *technical* point of view (by, for example, posting the required notice at the required time), but it failed to comply from a *practical* point of view because it omits or obscures important elements, leaving anyone not an expert unable to decipher it. The Permit contains aspirational goals rather than particularized objectives, and it refers to and relies on too much information that falls

23

wholly outside of its terms (which makes it impossible to figure out what the Permit requires without hunting for the underlying information in a way that requires far more expertise than one could reasonably expect). We also find it impossible to discern from the Permit when the County would have to complete critical tasks. *Second*, the Permit fails as a *substantive* matter because it does not contain ascertainable metrics that define how the County must comply, or whether at some point it has complied, with what all agree are two of the Permit's most important terms: regulation of TMDLs and the twenty percent requirement. We recognize the tension between the desire for specificity (both in tactics and in metrics) and the reality of achieving that granularity across a system as large as the County's, and so we acknowledge that these competing objectives must be balanced. That said, they need to be balanced in a way that allows meaningful public comment and participation and meaningful review of the Permit's compliance with the law.

### 1. The Permit does not give meaningful opportunity for notice and comment, and eludes judicial review.

#### a. The Environment Article requires that the public have an opportunity for notice and comment.

Section 9-324 of the Environmental Article requires explicitly that "[t]he Department shall give public notice of each application for a discharge permit as required by Title 1, Subtitle 6." Subtitle 6, in turn, requires that the public have a full opportunity to participate in the permitting process. Envir. § 1-601(a)(3). The notice of an application for a permit, for example, must include certain basic information:

(i)     The name and address of the applicant;

24

     *(ii)*    *A description of the location and the nature of the*
              *activity for which the permit has been sought;*

    (iii)   A reference to the applicable statutes or regulations
            governing the application process;

    (iv)   The time and place of any scheduled informational
            meeting or public hearing, or a description of where this
            information can be found;

    (v)    A description of where further information about the
            permit application can be found; and

    (vi)   Any other information that the Department determines
            is necessary.

*Id.* § 1-602(b)(2) (emphasis added). The statute no longer provides for a contested case hearing, *id.* § 1-601(b), but does authorize judicial review on behalf of a party that, as Anacostia has, "[p]articipated in a public participation process through the submission of written or oral comments." *Id.* § 1-601(c)(ii). And although the subtitle limits judicial review to the administrative record and objections raised before the Department, it permits review when:

    (i)    The objections were not reasonably ascertainable
            during the comment period; or

    (ii)   Grounds for the objections arose after the comment
            period.

*Id.* § 1-601(d)(1).

    Transparency is essential to effectuating the goals of the Act. "Public participation in the development, revision, and enforcement of any regulation, standard, effluent

25

limitation, plan, or program established by the [EPA] or any State . . . shall be provided for, encouraged, and assisted by the [EPA] and the States." 33 U.S.C. § 1251(e). The Supreme Court has acknowledged that NPDES permits "defin[e], and facilitat[e] compliance with, and enforcement of, a preponderance of a discharger's obligations under the [Act]." *EPA v. State Water Res. Control Bd.,* 426 U.S. 200, 205 (1976). A permit should translate big-picture environmental goals into specific obligations and measurable objectives for each applicant, and provide a way to hold permit-holders accountable—at least theoretically. This permit does not.

### b. Specific shortcomings of the Permit.

#### i. The public can't comment about decisions that have yet to be made.

To be sure, the process leading up to the Permit ostensibly allowed for several "public participation" opportunities. But the Permit deferred the process of defining important substantive provisions (TMDL implementation plans, SWMP plans, etc.) until well *after* approval. This creates an obvious flaw: the public can't comment on a program that doesn't yet exist, and by the time the program *did* exist, the time for comment on it had passed.[10]

---

[10] This also means that we can't tell from the Permit's terms whether it should be reviewed under § 1-601(d)(1)(ii), which allows for judicial review, even if objections weren't raised during a comment period, where the "[g]rounds for the objections arose after the comment period." *Id.* This Permit could well qualify because so many of its substantive terms weren't defined until after the comment period had passed.

Under the terms of the Permit, the Department effectively can approve new requirements and management projects without public comment because the County was not required to develop impervious surface restoration plans and TMDL implementation plans until after the Permit was approved. The Permit itself does not include the substantive contents of each program, nor does it require that the programs even be made available to the public for review after the fact. Part E of the Permit, for example, states broad requirements that the County must satisfy in developing, implementing, and maintaining its programs. But that approach is inconsistent with the emphasis on public participation in the Act, which requires permits to include effluent limitations so that citizens can enforce their terms, requirements, and restrictions. 33 U.S.C. § 1365(a).

In order to be measurable, a permit must articulate what the County must do, how much of each task the County must do, where the County needs to perform those tasks, and by when the County must complete them.[11] For each Permit requirement, the "what" is usually the BMP or activity required, the "how much" is the performance standard the County is expected to meet, the "when" is the specific time (or frequency) the BMP or activity should be complete, and the "where" is the location where the activity must be performed. Unless discernible requirements are contained in the permit itself, the public

---

[11] For the EPA's guidance in this regard, *see* Laura Gentile and John Tinger, U.S. E.P.A. Region IX, Stormwater Phase I MS4 Permitting: Writing More Effective, Measurable Permits, 135 (February 2003), http://water.epa.gov/polwaste/nps/stormwater/upload/2003_03_26_NPS_natlstormwater 03_13Gentile.pdf (last viewed February 19, 2015).

27

will have no way to know its terms or to assist the Department in the enforcement of the Permit, nor will the County know exactly what the Permit requires of it. And although there may be value in deferring the definition of certain terms until later, that deferral cannot deprive the public of notice and an opportunity to comment—that opportunity must somehow be replicated as those plans are developed and approved, at whatever point in time.

### ii. The Permit is not specific enough.

The Permit eludes notice and comment because there is not enough *in* it for the public fairly to comment *on* it. The Act requires that a state permit specify the "type, intervals, and frequency sufficient to yield data which are representative of the monitored activity." 40 C.F.R. § 122.48(b), 122.44(i)(1). Under § 1342, a permit such as this is also subject to EPA regulations governing permit applications, 33 U.S.C. § 1342(p)(4)(A), which require a "proposed monitoring program for representative data collection for the term of the permit," 40 C.F.R. § 122.26(d)(2)(iii)(D), and which describe the necessary data. This Permit, however, requires monitoring only in the Lower Paint Branch watershed, one of many affected by the County's system.[12] And although, as the Department argues in its brief, the Permit "requires the County to *assess* all of its watersheds" (emphasis added), the Permit itself requires the County only to "provide a

---

[12] We do not mean to suggest that a single watershed cannot qualify as a representative sample, but the Department hasn't made or supported that argument here, either in general or for the Lower Paint Branch watershed in particular.

28

long-term schedule for the completion of detailed assessments of each watershed in Montgomery County." That "long-term schedule" is not due until a year into the Permit's five-year lifespan, though, and the Permit says nothing about whether that schedule must require assessments before the Permit expires. And, again, the process defined in the Permit leaves no opportunity for public comment or judicial review of the schedule once the County proposes it.

The Department argues that *prior* iterations of the Permit required broader monitoring, and it may be that the Permit could satisfy its monitoring obligations by building on and incorporating monitoring work done previously. But if that is what the Department intended, the terms of the Permit need to reflect that so that the Permit's overall compliance with the Act's monitoring obligations can be understood and tested.

The Permit is similarly quiet about the County's reporting requirements. In the absence of specifics, the Department points to the BMPs in the Manual, which "are *designed* to be flexible so that regulatory agencies may adapt them to the highly variable nature of stormwater discharges." (Emphasis in original.) That may be so, but the Department must demonstrate in the Permit *which* of these BMPs it is choosing— otherwise, we are left with a Permit that is simply a now-fifteen-year-old (and very long) Manual.[13] We understand the need for flexibility, but someone seeking to understand the

---

[13] Counsel for the Department pointed out in response to the court's questioning at the Hearing that stormwater management facilities have to "install BMPs" as specifically required by the Permit, and she referred to the provision in the "Management Programs"

Permit's terms, or a reviewing body seeking to review it, is left at a total loss to understand how the County will proceed, either at the inception of the Permit period or during the five years (or more) it remains in effect.

### iii. The Permit overrelies on incorporation by reference.

The Permit's generality is compounded by the way it incorporates outside sources by reference. There is nothing wrong *per se* with that approach, but the result here is that someone outside the negotiations can't tell where to look to understand the Permit or how to challenge its terms. This is particularly true with regard to the Manual, a 589-page list of "best management practices." Chapter 1 of the Manual states that "[o]ver the last 14 years, tens of thousands of [BMPs] have been constructed in an attempt to meet program mandates." After the County selects appropriate BMPs, the Manual is meant to help in the process of actually implementing the practices, by

> provid[ing] design guidance on the most effective planning techniques, and nonstructural and structural BMPs for development sites, and to improve the quality of BMPs that are constructed in the [s]tate, specifically with regard to performance, longevity, safety, ease of maintenance, community acceptance and environmental benefit.

---

section under the Permit that requires the County at a minimum to "implement the stormwater management design policies, principles, methods, and practices found in the [Manual] and the provisions of Maryland's Stormwater Management Act of 2007." As counsel put it, these would be the "only BMPs allowed or acceptable."

Chapter 3 of the Manual identifies five groups of structural water quality Stormwater BMPs: (1) ponds, (2) wetlands, (3) infiltration practices, (4) filtering systems, and (5) open channels. The chapter goes on to discuss "sets of BMP performance criteria" for each BMP listed above. Of course, if the County opts to implement a new BMP, it must submit monitoring data to demonstrate that it meets these performance criteria. The Manual might provide some understanding, for example, of why the County would choose "ponds" for a given location, and why that strategy may or may not be successful in reducing pollution to the maximum extent practicable. But in the context of this Permit, there is no way of knowing which BMPs the County will select.[14] And that leaves no way to know what the County will be required to do until after the County does it, and no way to apply even an appropriately deferential level of review to the Department's substantive directions to the County.

We see compelling similarities to the permit in *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486 (2d Cir. 2005), in which the United States Court of Appeals for the Second Circuit held that NPDES permits for concentrated animal feeding operations ("CAFOs") lacked "any meaningful review of the nutrient management plans" developed by the

---

[14] Like the chapter preceding it, Chapter 4, "Guide to BMP Selection and Location in Maryland" may well be useful to those charged with designing the various management plans. The Chapter outlines the "process for selecting the best BMP or group of BMPs for a development site and provides guidance on facts to consider when deciding where to locate them." Again, had the Permit identified the BMPs to be used in each program, the Manual would explain the details in a useful way; without that information, it is academically interesting but not helpful to understanding this Permit.

applicants, and also "fail[ed] to require that the terms of the nutrient management plans be included in the NPDES permits." *Id.* at 498. The court held that regulation of the CAFO nutrient plans (which strike us as analogous to the MS4 regulatory program here) had to be incorporated into a facility's NPDES permit because a permit that omitted specific waste application rates did "nothing to *ensure* that each Large CAFO has, in fact, developed a nutrient management plan that satisfies [applicable federal regulations]." *Id.* at 499 (emphasis in original).

> There is no doubt that under the CAFO Rule, the only restrictions actually imposed on land application discharges are those restrictions imposed by the various terms of the nutrient management plan, including the waste application rates developed by the Large CAFOs pursuant to their nutrient management plans. Indeed, the requirement to develop a nutrient management plan constitutes a restriction on land application discharges only to the extent that the nutrient management plan actually *imposes* restrictions on land application discharges.

*Id.* at 502 (emphasis added).

Like the nutritional plans discussed in *Waterkeeper Alliance*, the Management Plans the Permit requires the County to develop represent the only restrictions on stormwater pollutants flowing into and from this MS4. For that reason, it is not enough for the Permit simply to require the County to develop plans consistent with the Manual and leave it at that. The Permit must at least allow the County and the public to understand how the County plans to restrict stormwater discharges and, subject to the appropriately deferential standard, to challenge the Department's ultimate directions.

32

The Permit purports to require, within a year of its effective date, implementation plans that include "the actions and deadlines by which those actions must be taken to meet the required pollutant load reduction benchmarks and [wasteload allocations] within the specified time frame." Determining the means to the ends, including TMDLs and SWMPs, has been left to the County, which gets one year out of the five-year lifespan of the Permit simply to *devise* implementation plans. In layman's terms, the Permit seems to say that the County has a deadline of a year to set its deadlines. But as a practical matter, that open-ended, goal-oriented statement articulates no specific method within the Permit (like setting out those benchmarks, for example) for achieving those goals or measuring progress. Put another way, the County seemingly could be in compliance if, within a year of the Permit's issuance, it laid out a plan with deadlines of twenty years from now. The Permit imposes no timeframe for executing the plans, and there are not clear requirements for what the aspirational plans must include.

Without measurable commitments, anything could be deemed "in compliance" with the Permit. And without deadlines for compliance and implementation, the County could plan while postponing implementation, an outcome that effectively would circumvent the NDPES permitting program. This is not to say that the Permit must list and measure minute details or water quality standards, only that it must contain some discernible and

33

meaningful milestones of planning, implementation, or achievement that can be understood and measured and, to our earlier point, that the public can review and comment upon.

The description of "Management Programs" in the Permit is also insufficient to allow meaningful evaluation of any monitoring. These programs appear to be an important aspect of the Permit, but are not incorporated as enforceable conditions. The Permit connects no specific or measurable BMPs to the various management programs. It requires no justification for why a given BMP or strategy was selected, and how that program or strategy will reduce discharges to the maximum extent practicable. The Permit contains no information about how the County must select, implement, maintain, and monitor BMPs, and most importantly, it contains no deadlines by which the County must actually implement the programs it designs.

This lack of meaningful deadlines was illustrated well at oral argument, when we asked counsel for Montgomery County whether the County had actually approved a plan that the Department then approved. Counsel first responded that yes, a plan "would have been" submitted. When pressed, counsel responded with continued hedging: "I will say that they would have approved it." The fact that counsel for the *County* couldn't even tell us the status of the Permit's progress highlights the toothlessness of the Permit's terms and the difficulty for anyone to know (or ask) whether the County is complying with them.

34

### 2. The agency decision to issue the Permit was unsupported by substantial evidence with respect to TMDLs and the twenty percent requirement.

Once the County reworks the Permit in a way that allows for meaningful notice and comment, it still must address the absence of objective metrics for what the parties agree are two of its most important elements: the twenty percent requirement and setting TMDLs.[15]

### a. The twenty percent requirement.

The Department argues that the Permit appropriately "requires the County to install controls on twenty percent of impervious surfaces and to regularly review and refine its [BMPs] to achieve steady and measured reductions in pollutants." But we see nothing in the Permit that explains how we or anyone can define the universe of impervious surfaces. Only one of the three sources the Department cites sends us to the Permit itself; the pages cited to govern "Watershed Restoration" (Part III.G), "Assessment of Controls" (Part III.H), "Program Funding," (Part III.I), and "TMDLs" (Part III.J). None of these gives any guidance as to exactly what constitutes "impervious surfaces." The Department claims

---

[15] This failing can be viewed in one of three ways: (1) the Department's decision to issue the Permit was legally incorrect because the Permit fails to require compliance with 33 U.S.C. § 1342(p)(3)(B) and Envir. § 9-324; (2) the Department's decision to issue the Permit was unsupported by substantial evidence that it complied with these statutory requirements; and (3) the Department's decision to issue the Permit was arbitrary and capricious because it was made without any factual support based on the record before it. Whichever the analytical path (and any is legally correct), the fact remains that neither the TMDL requirement nor the twenty percent requirement are laid out with sufficient clarity in the Permit.

35

that the twenty percent requirement is "specific, measurable, and enforceable," and it purports to lay out how the twenty percent is calculated, based on using the acreage designations from the *prior* permit's designation of ten percent of impervious surfaces in the County (in turn citing not even to the outdated permit, but to the "Annual Report for 2006 NPDES Municipal Separate Storm Sewer System Permit" that is included in the record extract):

> The permit requires the County to implement controls on 20 percent of its previously uncontrolled impervious areas. Because the prior permit required the County to install best management practices on 10 percent of its impervious areas, the County already has in place a mechanism for calculating the total acreage of land that does not have stormwater controls. That acreage comes to 21,458 acres - which excludes the 10 percent already controlled under the prior permit - and 20 percent of that amount comes to 4,292.

It cannot be that the universe of impervious surfaces has remained constant since 2006; by 2009, when this permitting process began, this information was already three years old. So the Department's calculation is grounded in outdated calculations and, therefore, unsupported by substantial evidence.[16]

---

[16] This failing also goes to the problems with public notice and comment. Although the Department has advanced this numerical calculation, we see no evidence that it was made apparent to anyone in the course of the permitting process. That means that, even if the Department could demonstrate to us now that the calculation is supported by substantial evidence, the public never had a meaningful opportunity to comment on that calculation at the appropriate time.

Anacostia is also correct that the Permit does not actually impose restoration of twenty per cent of *all* impervious surfaces within the County, but only mandates restoration of twenty percent of "impervious surface area *that is not restored to the MEP [maximum extent practicable.]*" As with so many other parts of the Permit, this definition requires another subjective calculation—where someone will need to determine what has not been restored to the maximum extent practicable—that is completely unreviewable.

The Department also contends broadly that the standards it applies for BMPs must be flexible "so that regulatory agencies may adapt them to the highly variable nature of stormwater discharges." We don't disagree with this proposition, and we are keenly aware that the Department has the expertise (far beyond the ken of this or any court) to determine these standards. But even those flexible standards have to be expressed in a way that gives meaning to the Permit, and that allows non-expert reviewing bodies to do their jobs.

The Department claims that the Permit articulates sufficiently specific BMPs for impervious surfaces by incorporating the Manual and other documents, and it argues that the BMPs in the Manual "have measurable outcome[s];" it points in particular to "general performance standards for stormwater management in Maryland" that appear in two pages of the Manual. The Manual is one of the three "scientific texts developed by the Department" that it claims encapsulates twenty-seven years of research. The others are a "BMP Assessment" (a March 21, 2009 report whose full title is "Developing Nitrogen, Phosphorus and Sediment Reduction Efficiencies for Tributary Strategies, BMP Assessment: Final Report, 3/31/2009"), and a manual entitled "Accounting for Stormwater

37

Wasteload Allocations and Impervious Acres Treated" (with the ambiguous date of "June *(Draft)* 2011" (emphasis added), which we will short-form as the "2011 Manual"). The Department says that it standardized best management practices in the Manual, and has technical guidelines "in place" based on the BMP Assessment and the 2011 Manual. But the Department's arguments are indecipherable. The "general performance standards" to which it cites don't appear, to us at least, to articulate useful or enforceable numbers, and a broad citation to three manuals (dated four, six, and fifteen years ago) leave the contours of the twenty percent requirement unclear.

### b. The TMDL requirement.

Anacostia argues that the Permit lacks the necessary clarity for attaining TMDL requirements, and that its provisions are not supported by facts or explanations. We agree. Part III.J requires the County to design a TMDL implementation plan that "includes estimates of pollutant loading reductions (benchmarks) to be achieved by specific deadlines and describe those actions necessary to meet the storm drain system's share of WLAs and EPA approved TMDLs." But the County is left to design these implementation programs *after* the final Permit is approved, and the TMDL plans do not become an enforceable condition of the Permit. Putting aside the notice problem, there are no enforceable minimum requirements for these plans, and they generally require no particular outcome from the measures that the County identifies in its TDML implementation plans. The only hard-and-fast requirement is that the County submit a *proposed plan* to the Department for

38

review within one year (and as we explained above, that proposed plan need contain no deadlines of its own).

The Permit incorporates, by reference, pollutant-loading limits (called Waste Load Allocations, or "WLAs") in approved TMDLs. It does not require the County to demonstrate that its TMDL implementation plans will meet the required pollution reductions or defend them against challenge, and it doesn't specify any interim or final deadlines for meeting those reductions. The County is left to set its own deadlines, without any outside limits. In the event that "WLAs are not being met according to the benchmarks and deadlines contained in the County's TMDL implementation plans, an iterative approach shall be used where additional or alternative Stormwater controls are proposed and implemented in order to achieve WLAs." It is hard to know what this means (and it is the language that was the source of palpable frustration on the part of the trial judge), but we know that there are no specific guidelines for implementing these "adaptive management activities," and no elaboration on what they might entail.

Perhaps inadvertently, the Department identified the problem best at oral argument: when the Court criticized the TMDL plan because it can't be challenged by the public, counsel answered that TMDLs are "on the MDE website," and that "there's a separate TMDL process." But that advice leads to a thicket: a search of the term "TMDL" on the MDE website yielded 771 results, the first of which purports to explain "TMDL Implementation in Maryland" from a 2006 issue of an "e-MDE" publication. *See* http://mde.maryland.gov/programs/ResearchCenter/ReportsandPublications/Pages/Resear

39

chCenter/publications/general/emde/vol1no9/tmdl.aspx (last viewed February 19, 2015).
And although there may be a "TMDL process," that process leaves anyone seeking to know what TMDLs are at issue in this Permit completely in the dark.

* * *

It may be that the actions and standards that the Department and County have in mind under this Permit satisfies the requirements that the Act imposes on both, and we agree with the Department about what the law generally requires. But there is no way for the public or for us to know from the Permit itself whether they do or not, and we agree with the circuit court that the Permit must be revised accordingly. We recognize the Department's expertise in this area, and we know that it is not our role to dictate precisely how the Department must balance the complex realities of managing pollution in a large stormwater system against the important public policies of transparency, public participation, and meaningful judicial review. It seems, though, that the more details are framed as future obligations to plan or propose plans, the harder it will be for the public to participate and for courts to review the Permit, even deferentially.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED AND CASE REMANDED TO THE MARYLAND DEPARTMENT OF THE ENVIRONMENT FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANTS.**

40